**Tina DEAL, a minor by Frank L. Deal, her father and next friend, et al., Plaintiffs-Appellants,**

v.

**The CINCINNATI BOARD OF EDUCATION et al., Defendants-Appellees.**

**No. 19210.**

United States Court of Appeals
Sixth Circuit.

Dec. 9, 1969.

Norris Muldrow, Cincinnati, Ohio (Robert L. Carter, Lewis M. Steel, Barbara Morris, New York City, on the brief), for appellants.

C. R. Beirne, Cincinnati, Ohio (William A. McClain, City Sol., Cincinnati, Ohio, Robert E. Manley, Beirne, Wirthlin & Manley, Cincinnati, Ohio, on the briefs), for appellees.

Before PHILLIPS, Chief Judge, and WEICK and O'SULLIVAN, Circuit Judges.

WEICK, Circuit Judge.

In the first appeal which involved a claim of alleged de facto rather than de jure segregation, we affirmed the judgment of the District Court on the issue of racial imbalance, holding that the Board of Education was not required by the Constitution to bus Negro or white children out of their neighborhoods, or to transfer classes, for the sole purpose of alleviating racial imbalance which was not caused by any act of discrimination on the part of the Board but resulted from the racial concentrations in the neighborhoods in which the schools were located, and further, that the Board had no like duty to select new school sites solely in furtherance of such a purpose. We further held that the findings of

fact adopted by the District Court with respect to racial discrimination in specific schools and programs were too general to afford an adequate basis for review of those issues. We remanded the case to the District Court—

> " * * * for further findings on the issues of claimed discrimination in specific schools and programs and claimed harm to Negro students, allegedly caused by racially imbalanced schools, and for the taking of such additional relevant evidence as either party may offer."

Deal v. Cincinnati Bd. of Educ., 369 F.2d 55 (6th Cir. 1966), affirming 244 F. Supp. 572, cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967).

On the remand Circuit Judge Peck sat as District Judge by designation because he had presided at the original trial. He held a pretrial conference to consider the programming of the proceedings on the remand. Plaintiffs took the position that new evidence of occurrences which had transpired since the first trial should be introduced. The Board contended that on the remand the issue was limited solely to adoption of supplementary findings of fact with respect to claimed discrimination in specific schools and programs and claimed harm to Negro students, allegedly caused by racially imbalanced schools, which could be determined from the original record.

Judge Peck indicated that although he had doubt as to the admissibility of evidence of subsequent events under the terms of the remand, he suggested, and it was agreed by the parties, that plaintiffs set forth their claims formally either by tendering a second amended compaint or by seeking pertinent information by discovery procedures so that the matter could be adjudicated by the Court.

However, after the lapse of six months, and because the plaintiffs failed to take any action whatsoever, the Judge notified all counsel that he interpreted plaintiffs' inaction as an abandonment of any intention to supplement or attempt to supplement the record with additional evidence, and he invited counsel on both sides to submit suggested supplemental findings, which they did simultaneously. On September 30, 1968, Judge Peck filed a memorandum opinion and subsidiary findings of fact, a copy of which is appended hereto.[1]

The plaintiffs filed a notice of appeal, which stated in part:

> " * * * [P]laintiffs above named, hereby appeal from the memorandum and subsidiary findings of fact entered September 30, 1968, affirming the original judgment rendered on the 9th day of August, 1968."

At the outset, appellees stated in their brief:

> "There is a question as to whether or not this appeal was properly taken, because the District Court did not file an appealable order on September 30, 1968, and the only order from which the appeal is being taken was entered on the 9th day of August 1965. This order already has been reviewed.*

It is not understandable why appellants did not ask the District Judge to enter judgment on his memorandum and subsidiary findings of fact, as the entry of a judgment thereon would have eliminated any question about our jurisdiction.

If the District Court had not entered judgment on its original opinion and findings, we would have no hesitancy in dismissing this appeal for lack of jurisdiction. But judgment was entered by the District Court on its original findings, and in the appeal which followed

---

1. The memorandum opinion and subsidiary findings of fact stated: " * * * [T]his court's findings of fact are those set forth in the original opinion (244 F.Supp. 572) and herein, read together."
"* An appeal does not lie from findings of fact or from a memorandum opin- ion. Childs, et al. v. Ball Bros. Trucking Co., [5 Cir.] 193 F.2d 134; Rardin v. Messick, [7 Cir.] 78 F.2d 643; Breeding Motor Freight v. RFC, [10 Cir.] 172 F.2d 416." (Br., p. 4)

we did not disturb the judgment but affirmed it on the issue of racial imbalance and remanded only for subsidiary findings to aid us in the review of other issues with respect to discrimination in specific schools and programs, which we had not decided. Although we did not expressly retain jurisdiction, it could be argued that we did so by implication.

The District Court has completely complied with our order of remand, and the record and files have been docketed in our Court under the number of a new appeal, although they could have been filed in the first appeal.

The parties have briefed the issues on the merits. No motion to dismiss the appeal has been made. We will therefore consider and decide the issues left undecided in the original appeal. In so doing, we eliminate any further delay of this litigation, which already has been pending too long in all of the federal courts.

Upon the remand, the District Court properly made findings only on the specific issues referred to him in the mandate of this Court. Appellants had urged that the Court reconsider the entire case and adopt conclusions of law inconsistent with our opinion in the first appeal. This it declined to do.

The basic issue in the case was whether the Board had a constitutional duty to establish a program to balance the races in the Cincinnati School System. We dealt with this issue extensively in our opinion in the first appeal and held that there was no such duty where the imbalance had resulted from racial concentrations in the school neighborhoods and not from any act of discrimination on the part of the Board. We were of the belief that the Constitution prohibited enforced segregation but did not require forced integration. 369 F.2d 55. In so holding we followed appellate decisions in the Tenth and Seventh Circuits. Downs v. Bd. of Educ. of Kansas City, 336 F.2d 988 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L. Ed.2d 800 (1965); Bell v. School City

of Gary, 324 F.2d 209 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964). See also decisions of the Second and First Circuits in Offermann v. Nitkowski, 378 F.2d 22 (2d Cir. 1967), and Springfield School Committee v. Barksdale, 348 F.2d 261 (1st Cir. 1965); cf., Mapp v. Board of Education of Chattanooga, Tenn., 373 F.2d 75, 78 (6th Cir. 1967).

Appellants petitioned the Supreme Court for certiorari in the first appeal and it was denied. Certiorari was also denied in Downs and Bell, supra. The denial of certiorari in the present case ought to constitute our opinion in the first appeal as the law of the case, but appellants contend that the law has been changed by the recent decisions of the Supreme Court in Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Bd. of Educ. of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Bd. of Comm'rs of City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

■ In our opinion, these three decisions did not change any law applicable to our case and appellants' reliance on them is misplaced. The gist of the holdings in these cases was that in desegregating a dual school system, a plan utilizing "freedom of choice" or a variant "free transfer" is not an end in itself and would be discarded where it did not bring about the desired result.

On the other hand, our case involves the operation of a long-established unitary non-racial school system—just schools where Negro as well as white children may attend in the district of their residence. There is not an iota of evidence in this record where any of the plaintiffs or any of the class which they represent, was denied admission to a school in the district of his residence.

■ It is the contention of appellants that the Board owed them a duty to bus white and Negro children away from the districts of their residences in order that

the racial complexion would be balanced in each of the many public schools in Cincinnati. It is submitted that the Constitution imposes no such duty.[2] Appellants are not the only children who have constitutional rights. There are Negro, as well as white, children who may not want to be bussed away from the school districts of their residences, and they have just as much right to attend school in the area where they live. They ought not to be forced against their will to travel out of their neighborhoods in order to mix the races.[2a]

It was more than eighty-two years ago that the Legislature of Ohio abolished segregation in the public schools. 84 Ohio Laws 34, enacted February 22, 1887. The Supreme Court of Ohio upheld and enforced the law in the following year. Board of Educ. v. State, 45 Ohio St. 555, 16 N.E. 373 (1888). After enactment of this statute, the Cincinnati Board of Education promptly discontinued compulsory segregation in its school system, and ever since that time Negro children have had the opportunity to attend the neighborhood schools in Cincinnati on the same basis as white children living in the same locality. In the 60th Annual Report of the Public Schools of Cincinnati for the School Year ending August 31, 1889, it is stated:

"An increasing number of colored pupils are attending the Common Schools. They are in the schools in nearly every building in the city and their presence no longer causes comment. They are kindly treated and are making good progress in their studies."

The neighborhood school plan for the location of public schools in Ohio is provided for by statute, which requires School Boards to—

" * * * provide for the free education of the youth of school age within the district under its jurisdiction, at such places as will be convenient for the attendance of the largest number thereof." Ohio Rev.Code § 3313.48.

It is not questioned that the state legislature had the constitutional right and power to enact this statute.

In our opinion in the first appeal, we said:

"The neighborhood system is in wide use throughout the nation and has been for many years the basis of school administration. This is so because it is acknowledged to have several valuable aspects which are an aid to education, such as minimization of safety hazards to children in reaching school, economy of cost in reducing transportation needs, ease of pupil placement and administration through the use of neutral, easily determined standards, and better home-school communication." (369 F.2d at 60)

Appellants contend that housing patterns in Cincinnati are segregated as a

2. In the Civil Rights Statute, Congress has expressed itself rather clearly on this subject in 42 U.S.C. §§ 2000c, 2000c–6 and 2000c–9.
  Section 2000c, in defining desegregation, provides:
  " * * * [B]ut 'desegregation' shall not mean the assignment of students to public school in order to overcome racial imbalance."
  Section 2000c–6 provides:
  " * * * [T]hat nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such

racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."
  Section 2000c–9 provides:
  "Nothing in this subchapter shall prohibit classification and assignment for reasons other than race, color, religion, or national origin."

2a. The bussing required to alleviate racial imbalance would not only involve the expenditure of large sums of money for buses and drivers, but also, and of more importance, would expose the children so transported to the risk of personal injury, and their parents might well object to their assuming such unnecessary risk.

result of actions of both public and private agencies, and that the School Board "may not close its eyes to this reality" but should remedy it.[3] We are not told how or by what lawful authority the School Board can remedy the housing patterns of a neighborhood. Perhaps what appellants want is for the Court to order the Board to provide buses to transport children to other school districts where they do not reside, construct additional schools in such other districts where necessary to accomplish this purpose, and abandon the existing neighborhood schools. We find no basis to enter any such order.

We dealt with this same issue in the first appeal, and pointed out:

"The District Court correctly excluded evidence of alleged discrimination in the public and private housing markets. Such discrimination is caused, if in fact it does exist, by persons who are not parties to this case and the Board has no power to rectify that situation. If appellants have any valid claim for infringement of their rights by public housing or urban renewal officials, they may obtain appropriate relief against them under the Fourteenth Amendment. With respect to private actions amounting to discriminatory practice, while there is no federal constitutional right available to appellants, they may seek relief from the state Civil Rights Commission or in the state courts, if relief is denied, under the provisions of the Ohio Fair Housing Law. Ohio Rev.Code § 4112.-01–.07." (369 F.2d fn. 4 at 60–61)

Boards of Education can hardly be blamed or held responsible for neighborhood residential patterns.

█ In our opinion, the burden of righting wrongs alleged to have been committed by public or private agencies ought not to be foisted upon Boards of Education, which have enough problems of their own to solve in providing proper education for the young. Nor should such burden be saddled upon the owners of real property who are taxed in Ohio to provide funds for the operation of public schools. Appellants should invoke whatever remedy they have against the agencies which committed the alleged wrongs of which they complain. These agencies were not made parties to this case.

The District Court adopted eighteen findings of fact dealing with specific schools and programs which appellants complained were formulated to promote or perpetuate segregation in the public schools of Cincinnati. Contrary to appellants' contention, the Court found that the schools and programs were not formulated for any such purposes and that school zone lines were not gerrymandered to exclude Negroes from certain schools.

The Court found a high correlation in the distribution of Negroes throughout the school system to the general neighborhood residential patterns. There were many areas, formerly predominately white, which were changed to predominately Negro by the movement of Negroes to the neighborhoods, and this was reflected in the increase in the number of Negro children attending the schools there.

Virtually every possible proportionate combination of Negro and white students exists in some schools in Cincinnati and the proportions are not constant. In a short period of time in which there had been no change in school zone lines, twelve Cincinnati schools changed to a heavy concentration of Negro pupils.

In Northcross v. Bd. of Educ. of City of Memphis, Tenn., 302 F.2d 818 (6th Cir. 1962), cert. denied, 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed.2d 810, we outlined the minimal requirements for nonracial schools:

"Minimal requirements for non-racial schools are geographic zoning, ac-

---

3. This contention assumes that except for the action of the public and private agencies, significant numbers of Negroes would have the desire and the means to move out of their neighborhoods.

cording to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right." *Id.* at 823.

These requirements were met in the present case.

The Court found that topographical characteristics of the City of Cincinnati, combined with man-made barriers such as railroads, highways and expressways, compel the use of irregular boundary lines in composing the various school districts.

In the selection of school sites the Board had to take into account a number of factors. It was required to comply with the Ohio statute, Ohio Rev.Code § 3313.48, by selecting locations in areas of the heaviest concentration of children. Even in the absence of such a statute, it would seem prudent to locate the schools where they will be easily accessible and convenient to most of the children and without the necessity of bussing the children or their crossing dangerous thoroughfares. The Board should consider locations in areas that are being developed where large population increases are anticipated, and locations in areas where the Board already owns property. We find no abuse of discretion in the location of the schools. Nor do we think that we should tell the Board where to locate schools in the future.

Federal Courts are ill-fitted to instruct Boards of Education where to select school sites, draw zone lines, or how to operate the public schools. We should intervene only where there has been a clear invasion of constitutional rights, and in our judgment that has not occurred here.

The Court placed little credence in the testimony of two expert witnesses who were professors at Antioch College, in Yellow Springs, Ohio, and at Washington University in St. Louis, respectively. The Court stated that the professors—

" * * * agreed that any deleterious effects that may have been attributed to a racially imbalanced

school could, with equal probability, have been caused by preschool age family influences, neighborhood social environment, the family's economic status, and other socio-economic forces concededly beyond the control of defendants. Neither witness could explain why one 100% Caucasian school was being over-achieved by each predominately Negro school in the Cincinnati system in a way that was consistent with their primary assertions." (Supp.App. 30)

The District Court found that the testimony of the experts did not make an issue calling for rebuttal. The Court was not bound by their testimony. It found no deprivation of equal educational opportunity.

There may be a reasonable basis for inferring harm to Negro or white children who are the victims of discrimination; however, as we have pointed out, the Court found against the plaintiffs on the factual issues of discrimination, and that no harm resulted. We agree that the evidence supports these findings. There is no basis for our inferring harm to anyone.

Appellants further complain of discrimination in hiring and assigning of school personnel. As of 1964–65, Negroes comprised 626.5 or 21.20% of the teaching staff. We find no evidence of discrimination. There was no constitutional duty on the part of the Board to balance the races in teachers' employment and assignments. Teachers should be selected primarily on the basis of merit.

It appears from the evidence that the Board has endeavored to integrate its staff and had achieved a reasonably balanced staff in each school. Superintendent Pierce testified:

"The policy of balancing a staff is that you take each individual school, and you want to be sure that you have distribution in age, distribution in sex, distribution in all qualities that make for a well-rounded staff. In that particular instance race becomes like

any personality characteristics of the individual." (81a)

Superintendent Pierce further testified that in determining assignments—

"Racial balance is a consideration, however, it is based upon the best person for that particular job, and sometimes we don't put a Negro in a school because of that reason, he is not the best person for that." (82a)

■ There is no evidence in the record that the Board assigned teachers or other staff members on the basis of race. The evidence demonstrates the contrary, namely, that the Board was actively attempting to integrate its staff at all levels, and that to do so it had to consider the race of the person to be assigned.

Appellants claim that Dr. Philip Rothman's study of statistics of predominately Negro and predominately white populated schools reveals that the children in the predominately Negro schools were receiving an inferior education because they had: (1) more substitute teachers; (2) less qualified teachers with fewer degrees; (3) more temporary classrooms in use; and (4) more overcrowded schools. They claim that all of these factors allegedly combine to inhibit the child's learning process. The trouble is that Dr. Rothman's opinion lacked evidentiary support. Dr. Rothman based it on his examination of certain records. He was not familiar with the Cincinnati School System. The overcrowding was not limited to schools attended predominately by Negroes, but existed also in schools attended predominately by white pupils. The cause of overcrowding in some of the schools was actually due to the mobility of the Negro population, over which the Board had no control.

The District Court found:

"There is no inequality of educational facilities based upon racial classification of students in the Cincinnati Public Schools."

■ In our judgment, this finding is supported by substantial evidence and is not clearly erroneous.

The Co-Op Training Program is a program in which local industries hire students and give them job training. Appellants argue that the Board sanctioned the discriminatory practices of industries which hired white students but refused to hire Negro students. Superintendent Pierce testified that it was more difficult to place Negroes in the jobs than white students. Appellants interpret this statement as sanctioning discrimination by a public agency.

A further reading of Superintendent Pierce's testimony reveals the following exchange:

"Q. Have you stopped dealing with the corporations that discriminate?

A. Yes." (110a)

■ Pierce never denied that the Board had difficulty in placing Negroes and that in many areas there were more whites than Negroes working. However, the Board cannot be held responsible for the conduct and practices of local industries of Cincinnati. The Board simply tried to place students where it could, and when it encountered discrimination it refused to do business with the companies which discriminated.

The District Judge did not make a specific finding of fact on this issue but found generally that the Board had not engaged in any discriminatory practices.

■ Having reviewed the appellants' evidence, we are of the opinion that the Board did not sanction discriminatory practices by local industries in the administration of its Co-Op Program.

Appellants' representatives spent about two and one-half years pouring over the books and records of the Cincinnati School System in an effort to find something that was wrong. Appellants offered in evidence 286 joint exhibits, 21 plaintiffs' exhibits, stipulations, answers to interrogatories, and testimony of witnesses. One stipulation agreed upon by the parties contains seventy-one pages. In lengthy briefs appellants complain about almost every-

thing in the operation of the Cincinnati School System.

The amended complaint is in form commonly used in actions for desegregation of dual school systems, where the Board is asked to submit a plan for desegregation. It is totally inappropriate here, where desegregation took place eighty-two years ago. We find no good reason for disrupting the operation of the Cincinnati School System.

It is not necessary for us to rule on the so-called "Voluntary Schools" which had been established at the request of Negroes but which no longer exist, or on other programs and practices which were discontinued prior to the filing of this lawsuit.

The District Court in two hearings found against appellants on the factual issues of the case. In our judgment, the findings of fact of the District Court are supported by substantial evidence and are not clearly erroneous. Its conclusions of law are correct.

Affirmed.

### APPENDIX

### MEMORANDUM AND SUBSIDIARY FINDINGS OF FACT

(Filed September 30, 1968)

Following the entry of judgment herein after the sustaining of defendants' motion therefor at the close of plaintiffs' case, they perfected an appeal. The judgment thereafter entered in the Court of Appeals contained the following language:

" * * * It is now here ordered and adjudged by this Court that the judgment of the * * * District Court in this cause be and the same is hereby affirmed on the issue of racial imbalance not intentionally caused by the Board, and the case is remanded for further findings on the issue of claimed discrimination in specific schools and programs and claimed harm to Negro students, allegedly caused by racially imbalanced schools, and for the taking of such additional relevant evidence as either party may offer.*

Following the remand, a chambers "conference to discuss the programming of the further proceedings" was held with all of counsel present. It will be recalled that the record in this matter consists of extensive stipulations, hundreds of pages of exhibits and all of the evidence presented by plaintiffs at the trial. Against that background, the chambers conference was opened by our asking counsel "[W]hat area of proof you would suggest is available which is not already contained in the record that exists in the District Court?" In response, counsel for plaintiffs indicated their desire to supplement the record with evidence of "new school construction [which] has added to segregation in Cincinnati," and a reluctance "to begin the process of winding our way up to the Supreme Court and have a case get there on 1964 facts." We indicated doubt as to the admissibility of evidence of occurrences and developments subsequent to those alleged as creating plaintiffs' cause of action in this manner: "We certainly recognize that at the very least litigation in this day and age is recognized as a proper vehicle for social reform. That's really what we are talking about here. But the fact remains that this does continue to be litigation and for that reason I would assume that the vehicle has to be kept on tracks established by the general rules of litigation. Since that's true, how is it possible within the confines of a rather narrow and restrictive mandate to in effect try a new law suit?"

At the conclusion of a full discussion of that question, at the suggestion of the Court it was agreed that plaintiffs' counsel would attempt to get allegations or evidence of the intervening occurrences and developments into the record

---

* Plaintiffs' motion for certiorari was denied October 9, 1967 (389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114)."

either by tendering a second amended complaint alleging them or by seeking pertinent information by discovery procedures. Counsel for both parties indicated satisfaction with this procedure since it offered whichever party might have been ultimately aggrieved by the ruling of the Court on the tendered amendment or objections to discovery an opportunity to record an exception to that ruling.

When at the end of a six months' period no attempt had been made to pursue either alternative, and it appearing probable that after further study plaintiffs' counsel had concluded that evidence of events subsequent to the accrual of the cause of action alleged would not be admissible, we advised counsel by letter that we "assumed that plaintiffs have abandoned their * * * indicated intention to supplement, or to attempt to supplement, the record." Parenthetically, we offer the view that if there have indeed been intervening occurrences and developments constituting invasions of constitutional rights, they could appropriately form the basis of separate litigation, even though they may not properly be appended to the present action. Our letter further advised counsel "that any suggested findings of fact received from any of counsel" would be taken into account and considered in the preparation of the further findings and conclusions required by the mandate of the Court of Appeals.

Responsive to that invitation, and under agreement entered into by them, counsel for both parties simultaneously filed suggested findings of fact. Those documents have been meticulously prepared and have been of great assistance in the findings which hereinafter appear. However, our findings are much more restricted in scope because of the limited nature of the Court of Appeals' mandate. Our original opinion herein was by its terms "filed as the Court's findings and conclusions in compliance with Rule 52 (a), Federal Rules of Civil Procedure," and it is not only not deemed necessary to reiterate the material set forth in that opinion, but it also would appear that such repetition would constitute only a burdensome excess. Accordingly, and in conformity with what we understand to be the direction of the Court of Appeals, this Court's findings of fact are those set forth in the original opinion and herein, read together.

Plaintiffs urge that a group of Supreme Court cases have substantially modified the law since the date of the Court of Appeals' decision herein. The cases cited in this context are Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, Raney [sic] v. Board of Education, Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 and Monroe v. Board of Commissioners of City of Jackson, Tennessee, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733, all of which were decided May 27, 1968. However, none of these cases is applicable because each involved a review by the Supreme Court of desegregation plans in school districts that had formerly operated under de jure segregation. So-called "freedom of choice" plans had been adopted in each instance, and it was held that they did not comply with the desegregation requirement of Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). In his opinion in the present case, Chief Judge Weick observed, "At the outset it should be pointed out that the State of Ohio abolished segregation in the public schools on February 22, 1887, which was more than 67 years before the Supreme Court barred it on constitutional grounds in the momentous decision of Brown v. Board of Education, 347 U.S. 483, 74 Sup.Ct. 686, 98 Law Ed. 873 (1954)." The record herein clearly supports our earlier determination that while segregation in the Cincinnati public educational system was practiced between 1849 and 1887, since that date Negroes have attended neighborhood schools on the same basis as white children living in the same locality. The group of cases cited above dealt with situations in which the imbalance between white and Negro children was

caused by an act of discrimination on the part of the school authorities, and accordingly present an entirely different situation than that here under consideration.

Speaking for the Court of Appeals in the present case, Chief Judge Weick anticipated the line to be drawn between such cases as the group cited by plaintiffs in which a new plan was being put in effect and those like the one before us where a neighborhood school plan had long been followed in this language (369 F.2d 63): "Further, it is clear that the duty of a school board in first imposing a neighborhood districting system where none was used before, is different from that where the system has been used for many years and the imbalance in the schools is the result of population mobility among the various neighborhoods. In Dowell [Dowell v. School Board of Oklahoma Public Schools, 244 F.Supp. 971 (W.D.Okl.1965)] the Court noted that the relative immobility of the Negro residents was used by the school board in separating them through the neighborhood policy, while in Cincinnati one of the primary causes of imbalance has been the rapid movement of the Negro population into different areas of the city."

Plaintiffs complain that at the trial of the present action evidence of racial discrimination in the public and private housing market was improperly excluded. The Court of Appeals made the following observation in this regard (369 F.2d 60, Note 4):

"The District Court correctly excluded evidence of alleged discrimination in the public and private housing markets. Such discrimination is caused, if in fact it does exist, by persons who are not parties to this case and the Board [of Education] has no power to rectify that situation. If appellants have any valid claim for infringement of their rights by public housing or urban renewal officials, they may obtain appropriate relief against them under the Fourteenth Amendment. With respect to private actions amounting to discriminatory practice, while there is no federal constitutional right available to appellants, they may seek relief from the state Civil Rights Commission or in the state courts, if relief is denied, under the provisions of the Ohio Fair Housing Law. Ohio Rev.Code § 4112.-01–07."

Plaintiffs now present the interesting argument that this determination of the Sixth Circuit Court of Appeals, "should no longer be controlling" on this Sixth Circuit District Court, but that we should instead follow an opinion of the Fourth Circuit (Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37 (4th Cir. 1967)).

As is indicated in the quotation from its judgment set forth at the opening of this Memorandum, the Court of Appeals agreed that racial imbalance in the Cincinnati schools had not been shown by plaintiffs to have been intentionally caused by the Board of Education and affirmed our conclusion on that issue. In connection with what the Court of Appeals determined to be a deficiency in our original opinion the reviewing court pointed out that while plaintiffs offered expert evidence on the subject of the harm resulting to a Negro from the impairment of his capacity to learn because of his school's racial imbalance, but that since its motion to dismiss at the close of plaintiffs' evidence was granted, the School Board offered no opposing expert testimony. The Court of Appeals went on to observe, "No findings were made on these disputed issues. Without findings we are unable to determine whether discrimination existed with respect to specific schools and programs." The opinion then states the purpose of the remand in the language incorporated in the judgment above quoted.

Both in their original brief and in their proposed findings plaintiffs marshal many facts and figures from the record pertaining to the various schools in the Cincinnati system. They indicate the percentage of white and Negro students and teachers in different schools, the percentage of substitute teachers in the predominately white and Negro schools respectively, the comparative use of tem-

porary classrooms in such schools, their comparative staffing by teachers with and without regular contracts and with and without masters degrees, and claimed differences in facilities in the different schools. An attempt is then made to correlate these and similar factors with pupil achievement and to thereby establish cause and effect.

To establish this relationship plaintiffs relied primarily on two expert witnesses. One of them had never even been in a school in the Cincinnati system; needless to say he had never taught in or been associated with the Cincinnati schools, and he had never lived in the city. The second expert witness possessed no greater familiarity with the Cincinnati situation. Both testified of obvious necessity in broad, general terms. In at least one important area, the second witness admitted that he was "puzzled" because an established factual situation in a Cincinnati school was inconsistent with his conclusion. Even in the case of the physical sciences, acceptance of a witness's qualifications for the purpose of permitting him to express an opinion as an expert does not require the trier of the facts to accept an opinion so expressed, and in an area as nebulous as we have here entered there is at best no greater compulsion to accept an expert's opinion. We decline to do so, and as is indicated by the sustaining of defendants' motion for judgment at the close of plaintiffs' case, such evidence was not considered of sufficient weight to require rebuttal.

In partial response to the inquiry of the remand, it is found and determined that neither gerrymandering nor any other alleged discriminatory practice on the part of the Board brought about such racial imbalance as existed, and that plaintiffs' expert testimony is found not to have been of such relevance, weight and probative value as to make an issue calling for rebuttal proof by defendants. Further response to the inquiry of the mandate is submitted in the Findings which follow:

## SUBSIDIARY FINDINGS OF FACT

1. From 1849 to 1887, separate educational facilities for Negro and white children were required by law. Thereafter the Cincinnati Board of Education (hereinafter the "Board") established nondistricted schools for Negro children attended by them on a voluntary basis. No such schools have existed in the Cincinnati system since 1955 when the last such school was districted. Except for such voluntary attendance in such districted schools, since 1887 Negroes have attended neighborhood schools on the same basis as white children.

2. The Cincinnati schools operate under a neighborhood school plan which divides them into elementary, junior high and senior high schools. The senior high school attendance zone is made up of the attendance zones of the nearby junior high schools, which in turn derive their student population from the nearby elementary schools. The topographical characteristics of Cincinnati combined with its manmade barriers in the form of railroads, public thoroughfares and more recently expressways compel the following of irregular lines and patterns in composing the various districts, and the determination of those lines is made by the Superintendent. A further factor in his determination is the avoidance where possible of predominantly Negro schools to the extent that the Board has any control over the causes which create such predominance.

3. Virtually every possible proportionate combination of white and Negro children exists in some school in the Cincinnati system. Carson School is 100% white while Dyer is all Negro. Hartwell School is 4.55% Negro, Hyde Park School has 14.61% Negro pupils, Clifton School is 20.99% Negro, Guilford School has Negro attendance to the extent of 39.06%, and so forth. The proportions are not constant. During a relatively short period of time in which there were no substantial changes in school attendance zone lines twelve Cincinnati

schools changed to a heavy concentration of Negro pupils.

4. The only exceptions to the neighborhood school plan are found in connection with Walnut Hills Junior and Senior High Schools, which provide a special college preparatory program open to students recommended by their elementary principals, Central High School, which provides special technical training, and special programs arranged to meet the needs of physically handicapped, deaf and blind students, and slow learning students. In 1964–65, 17.05 percentage of the Walnut Hills Senior High School was Negro, and of Walnut Hills Junior, 28.-36%. During that year the percentage of Negroes in Central was 35.62.

5. There is not substantial evidence in the record to support plaintiffs' claim that attendance school boundary lines have been gerrymandered to exclude Negroes from certain schools. There is a high correlation of the distribution of Negroes throughout the school system to the general neighborhood residential patterns. Many areas which were formerly predominately white then had schools attended predominately by white pupils, now are predominately Negro and the schools therein are similarly now predominately Negro.

6. The area served by Lincoln Elementary School was assigned to Withrow Junior High School rather than to Eastern Hills Junior High School on the basis of geographical and fiscal considerations, and there is no evidence to support the contention that the determination was a gerrymandering to exclude Negroes.

7. The controversial change in the attendance zone boundary line between the Evanston Elementary School and the Hyde Park Elementary School in 1956–57 temporarily increased the number of Negroes in the predominately white Hyde Park School, but was without lasting effect on the racial composition of the Evanston School. The change was made to correct a condition of overcrowding at Evanston and to take advantage of available vacant space at Hyde Park.

8. The opening of Ach Junior High School in September, 1950, precipitated changes in attendance areas of Withrow Junior and Woodward Junior High Schools. These resulted from routine administrative decisions rather than any racial consideration. The evidence establishes that pupil assignments were based on school building capacities and the requirements of increasing numbers of children.

9. Schools throughout the Cincinnati Public School System are overcrowded. The Division of Research, Statistics and Information of the Cincinnati Public Schools aided by the Bureau of Educational Research and Service of the Ohio State University prepared a report, "Survey of School Plant Needs, Cincinnati Public Schools." When this case came to trial school construction recommended in this report was either recently completed, under construction, or soon to be commenced. The evidence shows no relationship between the racial composition of a neighborhood involved and the decision of whether or not a new school building would be built there.

10. The survey of school plant needs called for four junior high schools (in Madisonville, Mt. Washington, Mt. Lookout and Walnut Hills-Evanston) in the Withrow High School district. While junior high schools were in construction or contemplation in these areas a large population shift occurred involving a large influx (predominately Negro) into Walnut Hills and Evanston. This gave rise to contentions that attendance zone boundary lines were determined on a basis of race, but the evidence establishes that such was not the case and that the determination of the lines constituted a reasonable exercise of discretion by the Superintendent.

11. Aiken High School was opened in September, 1962 in an area known as College Hill. The topographical character-

istics of that area are even more extreme than in other Cincinnati areas and the establishment of zone attendance boundary lines is accordingly even more difficult, and further complications were created by an unanticipated enlargement of the student population. The decisions made by the Superintendent with regard both to Aiken and to schools having correlated problems were on the basis of his professional judgment as to the most appropriate way to provide school accommodations, and were not made on the basis of race. No significant change in the racial composition of the schools resulted from these administrative decisions.

12. Madisonville is a Cincinnati neighborhood composed of both Negro and white residents. In September, 1964, Bramble Elementary School was opened to serve the southeastern portion of the Madisonville attendance zone. Then and immediately thereafter boundary line changes were made and consideration of the Madisonville-Bramble school attendance zone lines prompted the adoption by the Board of the statement of policy of March 9, 1964, set forth in full in our original opinion (244 F.Supp. 581). The determination of these zone boundary lines constituted a reasonable exercise of the Superintendent's administrative discretion and was not based on an attempt to gerrymander lines in order to artificially separate races. On the contrary, the determination was intended to result in maximum interracial experiences among the children.

13. At the beginning of the 1963–64 school year a transfer of pupils was necessary in order to relieve overcrowding of the Evanston School building, predominately populated by Negro students. In accordance with established policy, these temporary transfers, which were accomplished by the use of buses, were of classes which then occupied rooms in the Oakley School, predominately otherwise occupied by white students. As is indicated by the charts prepared in connection with these various transfers

which were received in evidence, difficult and complicated administrative problems were presented. Transportation of pupils a substantial distance from their homes in a predominately Negro neighborhood to a predominately white neighborhood was necessary. The determination both of the need for the transfer and the means of accomplishing it was a reasonable exercise of discretion by the Superintendent. It was not undertaken for the purpose of separating races, and in fact placed them in greater proximity with one another.

14. An emergency situation developed in the Millvale area during the 1956–57 school year which persisted through the next two years. This resulted in large part because of the opening of a new Metropolitan Housing Authority housing project the occupancy of which resulted in an overtaxing of the Garfield and Washington Elementary Schools that normally served the neighborhood. The Authority had announced that this would be an integrated housing project but only Negro families moved in. Rather than move small groups of students from school to school each year as various classrooms became available the Superintendent decided to transport all of the pupils as a group to the Douglas School, it being the only one which could accommodate such pupils throughout the entire period of emergency. The course chosen was more economical, was more efficient administratively and avoided the probability of having children of the same family in different schools at the same time. The charts and graphs received in evidence showing the number of students involved, the schools in which space was available and the geographical relationship of the various schools demonstrate the complexity of the problem. The solution adopted by the Superintendent constituted a reasonable exercise of his discretion, pursuant to his power and duties under the law of Ohio. This exercise of discretion did not constitute an unlawful abuse thereof and was not undertaken for the purpose of artificial separation of races.

15. Defendants have consistently withstood efforts to assign children to schools on the basis of race, and successfully defended (on the basis of the neighborhood school policy) litigation instituted by white parents who did not want their children to attend schools with Negro children. Applications for transfer from one school to another to avoid attendance with schools [sic] of another race have been denied.

16. There is no inequality of educational facilities based upon racial classification of students in the Cincinnati Public Schools.

17. Evidence containing detailed test data for all of the Cincinnati schools arranged in accordance with the percentage of Negroes in each school does not establish any relationship between racial composition of the school and pupil achievement. For example, five schools had exactly the same median grade equivalent on the Stanford Immediate Achievement Test and had the following percentage of Negro pupils: 0, 8, 15, 99 and 100.

18. Plaintiffs' two expert witnesses (professors from Antioch College, Yellow Springs, Ohio, and Washington University, St. Louis, Missouri, respectively) agreed that any deleterious effects that may have been attributed to a racially imbalanced school could, with equal probability, have been caused by preschool age family influences, neighborhood social environment, the family's economic status, and other socio-economic forces concededly beyond the control of defendants. Neither witness could explain why one 100% Caucasian school was being over-achieved by each predominately Negro school in the Cincinnati system in a way that was consistent with their primary assertions. Plaintiffs' expert testimony is not of such relevance, weight or probative value as to make an issue calling for rebuttal by the defendants.

/s/ John W. Peck

District Judge Sitting by Designation