**Mona BRONSON, et al., Plaintiffs,**

v.

**BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF CINCINNATI, et al., Defendants.**

No. C-1-74-205.

United States District Court, S.D. Ohio, W.D.

March 14, 1983.

Thomas I. Atkins, NAACP Sp. Contribution Fund, Brooklyn Heights, N.Y., NAACP Litigation Office, Cincinnati, Ohio, Leonard D. Slutz, Wood, Lamping, Slutz & Reckman, Trudy D. Rauh, Nadine Allen, John Burlew, Cincinnati, Ohio, Richard Stein, Columbus, Ohio, for plaintiffs.

John A. Lloyd, Jr., Sally Conley Lux, Glen Weissenberger, Cincinnati, Ohio, for City of Cincinnati School Dist., defendant.

A. David Nichols, Metzger, Phillips & Nichols Co., LPA, Cincinnati, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State of Ohio, Special Counsel to Atty. Gen., State of Ohio, represents State Bd. of Educ.

Gary E. Brown, Richard W. Ross, Asst. Attys. Gen., Columbus, Ohio, for William J. Brown, Atty. Gen., and James A. Rhodes, Governor, defendants.

James W. Farrell, Jr., Mark A. Vander Laan, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for Deer Park City School Dist., Madeira City School Dist., Mariemont City School Dist., North College Hill City School Dist., Norwood City School Dist., St. Bernard-Elmwood Place City School Dist.,

Reading Community City School Dist., defendants.

Bruce I. Petrie, Sr., John B. Pinney, Graydon, Head & Ritchey, Cincinnati, Ohio, for Indian Hill Exempted Village School Dist., defendant.

George E. Roberts, III, Ennis & Roberts, Cincinnati, Ohio, for Lockland City School Dist., defendant.

Michael E. Maundrell, Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, for Princeton City School Dist., defendant.

Lawrence McTurnan, McTurnan & Meyer, Indianapolis, Ind., for Finneytown Local School Dist., Forest Hills Local School Dist., Northwest Local School Dist., Three Rivers Local School Dist., Hamilton County School Dist., defendants.

John C. Elam, Suzanne K. Richards, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Wyoming City School Dist., defendant.

James W. Harper, Asst. Pros. Atty., Cincinnati, Ohio, for Oak Hills Local City School Dist., defendant.

Arnold Morelli, Bauer, Morelli & Heyd, Cincinnati, Ohio, for Green-Hills Forest Park City School Dist., defendant.

William E. Santen, William B. Singer, Santen, Santen & Hughes Co., LPA, Cincinnati, Ohio, for Sycamore City School Dist., defendant.

## OPINION; DECISION AND ENTRY OVERRULING MOTION FOR SUMMARY JUDGMENT BY CINCINNATI DEFENDANTS

RICE, District Judge.

### I. *Introduction*

This matter is before the Court pursuant to the motion for summary judgment filed on December 14, 1981, by the Board of Education of the City School District of the City of Cincinnati (hereinafter Board), and the other Cincinnati Defendants. Consideration of the Defendants' motion was de-

ferred pending the interlocutory appeal of this Court's February, 1982 decision regarding the appropriate effect to be accorded the previous Cincinnati school desegregation litigation, *i.e.*, *Deal v. Cincinnati Board of Education*, 244 F.Supp. 572 (S.D. Ohio, 1965), *aff'd*, 369 F.2d 55 (6th Cir. 1966), *cert. denied*, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), and *Deal v. Cincinnati Board of Education*, 419 F.2d 1387 (6th Cir.1969), *cert. denied*, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971). The Sixth Circuit rendered its decision on the interlocutory appeal on August 31, 1982, and this Court thereafter directed Plaintiffs to submit their response to the Defendants' motion by January 14, 1983. Plaintiffs filed their memorandum on January 20, 1983, and the Defendants then filed their reply memorandum. On January 28, 1983, this matter came on for an oral hearing before the Court, during which counsel for the Defendants asked permission to file a supplemental memorandum addressing the impact of certain "findings" made by the Department of Health, Education and Welfare (HEW) in connection with the Board's 1974 application for funding under the Emergency School Aid Act, 20 U.S.C. §§ 1601 *et seq.* (ESAA).[1] Permission was granted by the Court, and the materials submitted by the Board on February 7, 1983 have been fully evaluated by the Court in ruling upon the present motion.

Defendants, in an extensive memorandum, accompanied by hundreds of pages of exhibits, advance several grounds in support of their contention that summary judgment may appropriately be granted in their favor. Specifically, Defendants contend that the Cincinnati school system was adjudged to be a unitary, non-racial system as a result of the *Deal* litigation, and that Plaintiffs have been unable to produce a *single* segregative act which occurred subsequent to the July 26, 1965 date on which *Deal* was decided. The sole "alleged" exception to this state of affairs, argue De-

---

1. The ESAA was repealed and reenacted in 1979, and recodified at 20 U.S.C. §§ 3191 *et seq.* See, *Board of Education v. Harris*, 444 U.S. 130, 132, n. 1, 100 S.Ct. 363, 365, n. 1, 62 L.Ed.2d 275 (1979). For purposes of the present case, however, this factor is irrelevant.

fendants, concerns the 1974 recission of the 1973 "lame-duck" Cincinnati School Board resolution, which would have required the implementation of a massive busing program if it had remained in effect. Defendants maintain that the events surrounding the adoption of the 1973 resolution were structured in order to create liability on the part of the Board, that the 1973 resolution was promulgated in bad faith, and that the proposed plan for integration was unworkable. Defendants further claim that the present litigation is manifestly a "one-issue case," centering solely upon "whether the Cincinnati defendants can be held constitutionally liable for adopting and implementing the January 14, 1974 plan in lieu of the December 10, 1973 resolution." Cincinnati Defendants' Reply to the Plaintiffs' Memorandum in Opposition to the Cincinnati Defendants' Motion for Summary Judgment, p. 7.

In response to the above arguments, Plaintiffs contend that the Defendants' own documentation in support of the motion for summary judgment, including the December, 1973 Board resolution and the facts referred to therein, creates material issues of fact incapable of summary resolution. In particular, Plaintiffs point to the twenty-five schools cited in the Board resolution as having been the subject of purposefully segregative boundary changes, to the 1973 Open Enrollment Plan, which is alleged to have been intentionally discriminatory, and to the use of temporary classrooms for the purpose of creating or maintaining existing segregation. Plaintiffs' Opposition to Cincinnati Summary Judgment Motion, pp. 5–6. In addition to the above matters, Plaintiffs raise issues pertaining to various findings of HEW in 1974, including, inter alia, the specification of thirty-five schools in the Cincinnati Public School system which allegedly were the subjects of unlawful, discriminatory conduct. See, id. at 22–23.

As was previously indicated, the Defendants requested, and received an opportunity to counter the contentions made by Plaintiffs regarding the 1974 HEW ESAA investigation. In their Supplemental Mem-

orandum submitted in connection with this point, the Defendants maintain that the principal reason for the 1974 HEW rejection of the Board's application for funding was the Board's substitution of "voluntary student integration and mandatory staff racial balancing" for the massive busing required under the 1973 Board resolution. See, Cincinnati Defendants' Supplemental Reply, p. 4, n. 4. Defendants further contend that the 1974 factual summary is of no consequence to this action because it was predicated upon a disparate *impact* standard rather than upon discriminatory *intent*. See, *id.* at 6–7. Since the liability of the Cincinnati Defendants must be premised upon a showing of discriminatory intent, Defendants claim that findings based on disparate impact cannot raise issues of fact material to the present litigation.

After reviewing all materials submitted in support of, and in opposition to the within motion, as well as the pertinent legal authority, the Court has concluded that genuine issues of material fact do exist, and that, accordingly, summary judgment in favor of the Cincinnati Defendants is not warranted. In order to illustrate why denial of the Defendants' motion is required, the Court will briefly highlight certain areas of disputed fact, but will not, in the interest of time, exhaustively address each contention raised by the parties. With this point in mind, the Court will now turn to consideration of various matters which prohibit summary resolution of the claims against the Cincinnati Defendants.

## II. *Discussion*

As was previously noted, Defendants contend that the Cincinnati Public School System was decreed "unitary" pursuant to the *Deal* litigation, and further claim, based on this finding, that:

It is thus the task of the plaintiffs to present a prima facie case of constitutional violations by the Cincinnati Defendants subsequent to July 26, 1965. Plaintiffs cannot make such a case. As

more than seven years of discovery has amply demonstrated, *every decision made by the Cincinnati Defendants since July 26, 1965 has been either racially neutral or consciously integrative.*

Cincinnati Defendants' Motion for Summary Judgment, p. 13 (emphasis supplied).

Rather than supporting the above assertion, however, the documentation submitted to the Court by the Cincinnati Defendants, while voluminous, conspicuously neglects to refer in any *relevant* detail to actions of the Board during the period of time from July 26, 1965 to shortly before this lawsuit was initiated. For example, Defendants claim that student assignments, attendance zones, and feeder patterns have been administered in a racially neutral manner since 1965. *See*, Defendants' Motion for Summary Judgment, p. 104. However, the facts which are said to support this contention are drawn *almost entirely* from the years following 1974. *See, e.g.,* the following exhibits submitted in connection with Defendants' Motion for Summary Judgment: Ex. IV I, pp. 1–12 (detailing school closings and boundary changes from *1975* to 1981), and Ex. III E–2 to Ex. III E–8 (containing data regarding number and percent of Black pupils in each school in the Cincinnati Public School System for the years *1974* –1982).

One example will serve to effectively highlight the significance of the missing data. In their memorandum, Defendants make reference to the Taueber Index of Dissimilarity in order to illustrate that the Cincinnati Public Schools have become "increasingly integrative." Defendants' Motion for Summary Judgment, p. 111. According to Defendants:

> Taueber, who has been a witness for the N.A.A.C.P. in a number of school desegregation cases, testifies in part on the basis of a statistical method which he claims can measure the degree of racial imbalance within a school system. Taue-

ber's method is commonly referred to as the Taueber Index of Dissimilarity. Index numbers run from zero to 100, with racial imbalance growing less as the index decreases. That is, the smaller the Taueber Index Number, the more racially balanced the school system.

*Id.*

Although Taueber had not yet completed computation of Cincinnati's Index Numbers beyond 1976 at the time of the submission of the Defendants' Motion for Summary Judgment, Defendants calculated their own statistics, using Taueber's methodology. Even without an explanation of the relative significance of the values on the scale, one fact immediately becomes apparent upon an examination of Defendants' chart: between 1965 and 1974, the Cincinnati Public Schools were becoming *increasingly segregative.*[2] In fact, by the year 1973–1974, the Indexes of Dissimilarity for the Junior and Senior high schools had increased over 1965 levels by 6 and 9 points, respectively. *See*, Ex. III, D–8, attached to Defendants' Motion for Summary Judgment. Moreover, the Index Number for the elementary schools remained at the same level as had been achieved in 1965. Whether, and to what extent these increases were due to intentionally segregative actions of the Cincinnati Defendants remains to be seen. What is obvious, however, is that summary judgment is not appropriate based on the present state of the record, which poses far more questions than it does answers.

In the context of the current discussion, one additional point is in order. Defendants contend that Plaintiffs have utilized an impermissible legal standard, insofar as they seek to predicate a prima facie case of liability upon allegations that "the actions or inactions of the Cincinnati Defendants have the natural, probable and foreseeable consequence of increasing or perpetuating racial segregation." Defendants' Motion for Summary Judgment, p. 54. Initially, it

---

**2.** The Court uses the term "increasingly segregative" based on the theory that if a decrease in Index Numbers denotes an integrative effect, then, correspondingly, an increase in Index numbers signifies a segregative effect, or one of "racial separation regardless of cause." Defendants' Motion for Summary Judgment, p. 111 and n. 21.

should be noted that there is no indication either in ¶ 12, or in the remainder of the Second Amended Complaint, that Plaintiffs are attempting to establish a prima facie case in the manner suggested by Defendants. *See,* Doc. # 204, ¶ 12. Rather, the allegations in the Second Amended Complaint specify acts of purposeful discrimination. *See, e.g.,* ¶ 26 (alleging, *inter alia,* the design of attendance zones "in such a manner as to *build upon* the existing racially discriminatory patterns in both public and private housing.") (emphasis added).

Defendants further maintain that: "in the context of a unitary system, evidence of inaction, or evidence of action which perpetuates the status quo, can have no probative value whatsoever. Such evidence cannot support a Constitutional violation." Defendants' Motion for Summary Judgment, p. 55, citing from *Columbus Board of Education v. Penick,* 443 U.S. 449, 464–465, 99 S.Ct. 2941, 2949–50, 61 L.Ed.2d 666 (1979) (*Penick*). Resort to the cited portion of *Penick,* however, casts some doubt upon the validity of Defendants' interpretation. In *Penick,* the Supreme Court rejected the Defendant-Appellant School Board's contention that the lower courts had erred by considering "the requirement [of purpose of intent to discriminate] satisfied if it were shown that disparate impact would be the natural and foreseeable consequence of the policies of the Board, which, it is said, is nothing more than equating impact with intent, contrary to the controlling precedent." *Id.* at 464, 99 S.Ct. at 2949–50. In concluding that the lower courts had properly applied the test of discriminatory intent, the Supreme Court set forth the following standards, which will be applied by this Court in assessing the conduct of the parties involved in the present action:

The District Court ... was amply cognizant of the controlling cases. It is understood that to prevail the plaintiffs were required to " 'prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action,' " ... that is, that the school officials had "intended to

segregate." ... The District Court also recognized that under those cases disparate impact and foreseeable consequences, without more, do not establish a constitutional violation.... *Nevertheless, the District Court correctly noted that actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.* Those cases do not forbid "the foreseeable effects standard from being *one of the several kinds of proofs from which segregative intent may be properly drawn."* ... *Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.*

*Id.* at 464–465, 99 S.Ct. at 2949–50 (emphasis added) (citations omitted).

This Court is aware of Defendants' contention that certain kinds of actions are irrelevant because the Cincinnati system was deemed to be a unitary one as of July 26, 1965. However, the Supreme Court made no such distinction in *Penick;* rather, the Court's discussion, as quoted above, was directed to the requirement that "*a plaintiff seeking to make out an equal protection violation on the basis of racial discrimination must show purpose."* *Id.* at 464, 99 S.Ct. at 2949–50. As was noted by the Sixth Circuit in *Bronson v. Board of Education,* 687 F.2d 836 (6th Cir.1982):

The Supreme Court did not identify a new theory of liability in these cases [*i.e.,* in *Penick* and in *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 536, 99 S.Ct. 2971, 2978, 61 L.Ed.2d 720 (1976)]. Its affirmance of this court's judgment in each case was based on the determination that findings of intentional segregation in the school system of Columbus and Dayton were not clearly erroneous.

The plaintiffs in *Columbus* and *Dayton II were free to rely on any relevant*

*evidence to prove the existence of unlawful segregation.*

*Id.* at 841 (emphasis and parenthetical material added). Accordingly, this Court concludes that the determination of Cincinnati as a "unitary" system as of 1965 does not preclude consideration of evidence of "[a]dherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance." 433 U.S. at 465, 99 S.Ct. at 2950. Moreover, even if the relevant standard had been as Defendants suggest, it is by no means certain that the Board's actions constituted mere perpetuation of the status quo.

Although the preceding discussion provides more than ample justification for denying the Defendants' Motion for Summary Judgment, the Court will briefly address the issue of the 1974 HEW ESAA investigation, in view of the fact that considerable attention has been devoted to this matter, both at the oral hearing held in connection with Defendants' motion, and in various memoranda submitted by the parties.[3] In their memorandum in opposition to Defendants' motion for summary judgment, Plaintiffs maintain that summary judgment is precluded in light of certain 1974 HEW findings which indicated "substantial post-1965 *de jure* conduct" on the part of Defendants. Plaintiffs' Opposition to Cincinnati Summary Judgment Motion, p. 23. In response to this contention, Defendants claim, both in their reply memorandum, and in a supplemental memorandum filed subsequent to the January 28, 1983 hearing, that the HEW findings are essentially irrelevant, and, therefore, incapable of creating material issues of fact because the standard for determining eligibility for ESAA funding is *disparate impact* rather

than the constitutionally required test of discriminatory *intent.* *See,* Defendants' Reply Memorandum, p. 6, n. 2, and Defendants' Supplemental Reply Memorandum, pp. 6–7. While Defendants' argument possesses surface appeal, a closer examination renders it less than compelling.

First, it should be noted that the Supreme Court decision which established the disparate impact standard was rendered in 1979, five years after the HEW investigation in Cincinnati. *See, Board of Education v. Harris,* 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979) (*Harris*). In that decision, the Supreme Court observed that the statutory language pertaining to ineligibility for ESAA funding suffered "from imprecision and less than careful draftsmanship." *Id.* at 138, 100 S.Ct. at 368. After an analysis of the legislative history of the Act, however, the Court concluded that "the discrimination that disqualifies for funding under ESAA is not discrimination in the Fourteenth Amendment sense. Disproportionate impact in assignment of employees is sufficient to occasion ineligibility. Specific intent to discriminate is not an imperative." *Id.* at 149, 100 S.Ct. at 374. While there is not a substantial amount of pre-*Harris* authority interpreting the standards required for a finding of ineligibility under the ESAA, there are indications that the Act was felt to cover situations involving intent as well as impact. Thus, the ESAA was held to have prohibited "racially identifiable public school facilities *as well as policies and practices of racially discriminatory teacher assignments.*" *Kelsey v. Weinberger,* 498 F.2d 701, 711 (D.C.Cir.1974) (emphasis added).

More to the point, however, are the theories upon which HEW actually predicated its determination that the Cincinnati School

---

**3.** The 1974 HEW ESAA findings and the discussion incident thereto are *not* certified or authenticated in a fashion mandated by Fed.R.Civ.P. 56. Were these findings issue dispositive, insofar as the ruling on this motion is concerned, the Court would undoubtedly either not consider them at all or, as is more likely the case, would give the Plaintiffs a stated period of time (*i.e.,* 21 days) within which to properly authenticate these materials pursuant to Rule 56. There

appears to be no reason for following either such course of action, however, in view of the fact that, as indicated herein, the Defendants' motion must be overruled without reference being made to the 1974 HEW ESAA findings. A discussion of same is set forth in this opinion in deference to counsel and to the fact that much comment concerning these matters was made at the oral hearing on this motion.

District was ineligible for ESAA funding in 1974. Defendants contend, based on current representations of HEW, that HEW did, in fact, use a disparate impact standard in 1974, and that, consequently, any conclusions reached in connection with the 1974 ESAA funding application are virtually meaningless in the context of the present Fourteenth Amendment challenge to the School Board's conduct. *See,* Defendants' Supplemental Reply, p. 7. However, rather than relying upon hindsight justifications by government advocates, the present inquiry is far better served by resort to those representations which were made at the relevant time, that is, during the litigation before Judge Porter.

Without detailing exhaustively the procedural history of Cincinnati's struggle to obtain funding under the ESAA, the Court notes that Cincinnati first applied for such funding in December, 1973, but was determined to be ineligible in April, 1974. *See, Cincinnati Board of Education v. HEW,* 396 F.Supp. 203, 209 (S.D.Ohio 1975), *rev'd in part and aff'd in part,* 532 F.2d 1070 (6th Cir.1976). Shortly thereafter, the Board initiated an action against HEW in district court, seeking, *inter alia,* a review of HEW's determination of ineligibility. *See, id.* In that action, the Board contended that the recission of the 1973 lame-duck resolution constituted the sole ground for HEW's finding of ineligibility. *See, id.* at 226. Judge Porter noted HEW's specific denial of this point, and observed that HEW had asserted in response to the Board's cross motion for summary judgment, that: "[s]everal cases suggest that *the recission without anything more would constitute a violation of the Fourteenth Amendment, but that is not HEW's position in this case." Id.* at 227. In order to further clarify HEW's position, Judge Porter recited the following contentions made by HEW:

"[I]mplicit in the citation of the case law which accompanied this recission ground

was *the finding by OCR that a sufficient basis was to be found in the information available to it to show a pattern of discrimination such as that admitted in the December 10 resolution.* Thus, DHEW never relied solely on the effective recission of the December 10 integration plan standing in isolation as a violation of the ESAA regulations."

*Id.* (emphasis added).[4]

Judge Porter then stated:

H.E.W. cites specifically to various factors in addition to recission *which purportedly establish a broad pattern of discriminatory acts by the Cincinnati School Board* rendering them ineligible for ESAA funds .... *These factors include* the allegedly disproportionate assignment of minority teachers to racially identifiable minority schools; and *the conclusion of OCR that there was sufficient factual basis for the December plan recitations regarding such matters as the allegedly discriminatory policies pertaining to pupil attendance zones and temporary classroom units.*

*Id.* (emphasis added).

Thus, it is apparent that HEW was not concerned merely with disparate impact when it rejected Cincinnati's application in 1974. Moreover, any specter of doubt that the parties litigated with *more* than impact in mind can be given final interment based on Judge Porter's own articulation of the conduct required to establish ineligibility under the ESAA. Specifically, Judge Porter commented as follows:

The word "discrimination" is not specifically defined in the ESAA, nor in the regulations thereunder .... *Basically, however, discrimination refers to a denial of equal protection.* It is recognized that school authorities have a constitutional obligation not to engage in discrimination in this sense .... *Discriminatory acts, then, are those which*

---

**4.** OCR, which is referred to in the quotation in the main text, stands for the Office of Civil Rights. *See,* 396 F.Supp. at 209. That office, together with the Office of Education, partici-

pated extensively in the consideration of Cincinnati's ESAA application. *See, id.* at 212–213, and 215–217.

*violate the Constitution,* and discrimination is another way of referring to *de jure* segregation.

*Id.* at 225 (emphasis added) (citations omitted).

Based on his review of the record, Judge Porter denied summary judgment with respect to the ineligibility ground related to recission, but granted summary judgment to HEW based on a finding that HEW had not abused its discretion with regard to the three remaining grounds of ESAA ineligibility. *See, id.* at 230–242. On appeal, the Sixth Circuit held as follows:

> We agree with the District Court that the issue of non-implementation of a previously adopted desegregation plan *involves genuine issues of material fact* "unresolvable on the present record." We hold that the three other grounds advanced by HEW for denying the Board's application for funds *also involve genuine issues of material fact.* Therefore, the summary judgment must be reversed and the case remanded for appropriate evidentiary hearings and findings of fact.

532 F.2d at 1071 (emphasis added).[5]

Given the above holdings by the Sixth Circuit and by Judge Porter, it would be an act of sheer folly for this Court to conclude that no genuine issues of material fact exist regarding whether or not the Defendants acted with discriminatory intent subsequent to July 26, 1965. This is particularly so in view of the fact that the record before

this Court is regrettably little more complete than that presented previously to the district and appellate courts in the 1974 litigation. While Plaintiffs' submissions in connection with this motion could have been more detailed, the Defendants' documentation is more notable for what it neglects to mention than for that which it reveals. Accordingly, the Court must agree with Plaintiffs' contention that summary judgment herein is inappropriate based merely on issues of material fact contained in Defendants' exhibits.

### III. *Conclusion*

Based on the preceding analysis, it is apparent that genuine issues of material fact exist regarding whether the Cincinnati Defendants acted in an intentionally discriminatory manner subsequent to July 26, 1965. Accordingly, the motion for summary judgment filed by the Cincinnati Defendants is not deemed to be well taken, and is, hereby, denied.

---

**5.** This Court is aware that the ESAA decision involved determinations regarding whether HEW had abused its discretion. However, the underlying *facts* involved in that action, which both courts found to be in dispute, are similar, if not identical to many facts involved herein.

This Court is also cognizant of Defendants' contention that the *sole* issue in the present case involves the recission of the 1973 lame-duck resolution, which is said by Defendants to be of no significance, given the lack of any pre-existing duty to desegregate. *See,* Defendants' Motion for Summary Judgment, pp. 60–64. As should be apparent, this Court is not currently convinced, on the basis of the facts presented, that the 1974 recission either "stands alone" or

that there are no "cumulative acts of *de jure* segregation" occurring between 1965 and 1974, through which a duty to desegregate may have arisen. *N.A.A.C.P. v. Lansing Board of Education,* 559 F.2d 1042, 1055 & n. 15 (6th Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977) (issued subsequent to and with knowledge of the Supreme Court decision in *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 414, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977). It is not currently necessary to evaluate this issue in detail, however, given the fact that so few *relevant* facts regarding the above time span have been offered for the Court's consideration.