James E. SWANN, et al.,
Plaintiffs,

v.

The **CHARLOTTE–MECKLENBURG BOARD OF EDUCATION** et al.,
Defendants.

Civ. A. No. 1974.

United States District Court
W. D. North Carolina,
Charlotte Division.

Aug. 15, 1969.

See also D.C., 306 F.Supp. 1299.

Conrad O. Pearson, Durham, N. C., J. LeVonne Chambers, Adam Stein, James E. Ferguson, II, and James E. Lanning, Charlotte, N. C., Jack Greenberg, James M. Nabrit, III, and Norman Chachkin, New York City, and Gaston H. Gage, and Paul L. Whitfield, Whitfield, McNeely & Echols, Charlotte, N. C., for plaintiffs.

Brock Barkley, William J. Waggoner, Weinstein, Waggoner, Sturges & Odom, Charlotte, N. C., Robert Morgan, Atty. Gen., Ralph Moody, Deputy Atty. Gen., and Andrew A. Vanore, Staff Atty., State of North Carolina, Raleigh, N. C., for defendants.

## ORDER

McMILLAN, District Judge.

### PRELIMINARY SUMMARY

Pursuant to this court's June 20, 1969 order, 300 F.Supp. 1381, the defendants submitted on July 29, 1969 an amended plan for desegregation of the Charlotte-Mecklenburg schools, including a highly significant policy statement accepting for the first time the Board's affirmative constitutional duty to desegregate students, teachers, principals and staffs "at the earliest possible date." On August 4, 1969, a report was filed in connection with the plan. A hearing was conducted on August 5, 1969. The plan is before the court for approval.

■ Because the schools must open September 2, and because the Board's plan includes both substantial action and genuine assurance of sustained effort toward prompt compliance with the law of the land, the plan of operation, for 1969–70 only, is approved and as indicated below, the defendants are directed to prepare and file by November 17, 1969, detailed plans and undertakings for completion of the job of desegregating the schools effective in September, 1970.

### THE AMENDED PLAN—AND ITS RECEPTION

The plan proposes, among other things, to close seven old all-black inner-city schools and to assign their 3,000 students to various outlying schools, now predominantly white, mostly in high rent districts.

This technique of school closing and reassignment has been employed in dozens of school districts to promote school desegregation. It is not original with the local School Board.

The school closing issue has provoked strident protests from black citizens and from others; evidence showed that an estimated 19,000 names are listed on a petition denouncing the plan as unfair and discriminatory. The signers add their own brand of protest to that of the 21,000 whites who last May (though protesting their acceptance of the principles of desegregation) raised a "silk-stocking" community outcry against bus transportation except to schools of individual choice. Another 800 white Paw Creek petitioners have joined in protest against a part of the plan under which some 200 fifth and sixth grade pupils would be assigned to re-opened Woodland, a now unused (and formerly black) school. Comment from people who have not studied the evidence tends to ignore the law—the reason this question is before a *court*, for decision—and to concentrate on public acceptance or what will make people happy. A correspondent who signs "Puzzled" inquires:

> "If the whites don't want it and the blacks don't want it, why do we have to have it?"

The answer is, the Constitution of the United States.

### THE CONSTITUTION—THE LAW OF THE LAND—REQUIRES DESEGREGATION OF PUBLIC SCHOOLS

North Carolina reportedly refused to ratify the United States Constitution until the Bill of Rights had been incorporated into it. The Fourteenth Amendment to that Constitution, now part of the Bill of Rights, guarantees to all citizens the "equal protection of laws." In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the Supreme Court held that racial segregation in public schools produces inferior education and morale, restricts opportunity for association, and thus violates the equal protection guaranty of the Constitution and is unlawful. In Green v. New Kent County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and two other simul-

taneous unanimous decisions, the Supreme Court held that school boards have the *affirmative duty* to get rid of dual school systems, to eliminate "black schools" and "white schools," and to operate "just schools." The Court said:

> "The burden on a school board today is to come forward with a plan that promises realistically to work and promises realistically to work *now.*" (Emphasis on the word *"now"* was put in the text by the Supreme Court.)

For years people of this community and all over the south have quoted wistfully the statement in Briggs v. Elliott, D.C., 132 F.Supp. 776 by Judge John J. Parker (who at his death was one of my few remaining heroes) that though the Constitution forbids segregation it does not require integration. Passage of time, and the revelation of conditions which might well have changed Judge Parker's views if he had lived, have left Judge Parker's words as a landmark but no longer a guide. The latest decision on this subject by the Fourth Circuit Court of Appeals (which is the court that first reviews my actions) contains this statement:

> "The famous Briggs v. Elliott dictum —adhered to by this court for many years—that the Constitution forbids segregation but does not require integration, (132 F.Supp. 776, E.D.S.C. 1955) is now dead." Hawthorne v. County School Board of Lunenburg County, Virginia, 413 F.2d 53, Fourth Circuit Court of Appeals, July 11, 1969.

██ "Freedom of choice," as this court has already pointed out, does not legalize a segregated school system. A plan with freedom of choice must be judged by the same standard as a plan without freedom of choice—whether or not the plan desegregates the public schools. The courts are concerned primarily not with the techniques of assigning students or controlling school populations, but with *whether those techniques get rid of segregation of children in public schools.* The test is pragmatic, not theoretical.

## CONTINUED OPERATION OF SEGREGATED PUBLIC SCHOOLS IS UNLAWFUL

The issue is one of law and order. Unless and until the Constitution is amended it is and will be unlawful to operate segregated public schools. Amending the Constitution takes heavy majorities of voters or lawmakers. It is difficult to imagine any majority of Supreme Court, of Congress or of popular vote in favor of changing the Constitution to say that public school pupils may lawfully be kept in separate schools because they are black. A community bent on "law and order" should expect its school board members to obey the United States Constitution, *and should encourage them in every move they make toward such compliance.* The call for "law and order" in the streets and slums is necessary, but it sounds hollow when it issues from people content with segregated public schools.

*The question is not whether people like desegregated public schools, but what the law requires of those who operate them.*

## THE DUTY TO OBSERVE THE CONSTITUTION AND DESEGREGATE THE SCHOOLS CANNOT BE REDUCED OR AVOIDED BECAUSE OF SOOTHING SAYINGS FROM OTHER GOVERNMENT OFFICIALS NOR OUTCRIES FROM THOSE WHO WANT THE LAW TO GO AWAY

██ The rights and duties of the parties to this suit are in this court for decision according to *law*—not according to HEW guidelines or public clamor. The court and the school board are bound by the Constitution. *So are the legislative and executive branches of government.* No one in Washington or Raleigh or local government is above or beyond the Constitution. None have power to change it except by lawful means. None have *or claim* the power to interfere with the courts in cases like this one. The malle-

able HEW "guidelines" put out by the President's administrator for educational affairs, and dubious inferences from statements of other officials, however highly placed, are irrelevant to the constitutional rights of the parties in this case. Also irrelevant are soothing sayings of the Vice President (who has no duty in this area) to black-tie political audiences, and the not-so-soothing sayings of citizens who erroneously talk as if the school segregation issue were a simple matter of political pressure and short-term public opinion. As for the Attorney General of the United States, he has just filed the biggest desegregation suit of all—*against the whole state of Georgia*! Segregation of children in public schools, whether they be black or white, and regardless of whether they do or don't want to stay apart, is unlawful. As the Supreme Court said in *Brown II*:

" * * * the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them."

## THE SCHOOL BOARD'S NEW PLAN REPRESENTS SUBSTANTIAL PROGRESS

Against this background the Board's new plan is reviewed:

1. The most obvious and constructive element in the plan is that the School Board has reversed its field and has accepted its affirmative constitutional duty to desegregate pupils, teachers, principals and staff members "at the earliest possible date." It has recognized that where people live should not control where they go to school nor the quality of their education, and that transportation may be necessary to comply with the law. It has recognized that easy methods will not do the job; that rezoning of school lines, perhaps wholesale; pairing, grouping or clustering of schools; use of computer technology and all available modern business methods can and must be considered in the discharge of the Board's constitutional duty. This court does not

take lightly the Board's promises and the Board's undertaking of its affirmative duty under the Constitution and accepts these assurances at face value. They are, in fact, the conclusions which necessarily follow when any group of women and men of good faith seriously study this problem *with knowledge of the facts of the this school system and in light of the law of the land.*

2. In the second place, by the following actions the Board has demonstrated its acceptance of its stated new policies:

a) The desegregation of faculties and the nonracial reassignment of principals and employees from newly closed schools. In the formerly all-black faculties the Board has dramatically exceeded its goal. It is assumed by the court that this process of faculty desegregation will continue and that the goal for 1970–71 will be that faculties in all schools will approach a ratio under which all schools in the system will have approximately the same proportion of black and white teachers.

b) The closing of seven schools and the reassignment of 3,000 black pupils to schools offering better education.

c) The reassignment of 1,245 students from several overcrowded primarily black schools to a number of outlying predominantly white schools.

d) The announced re-evaluation of the program of locating and building and improving schools, so that each project or site will produce the "greatest degree of desegregation possible."

e) The Board correctly and constructively concluded that the so-called "anti-bussing law" adopted by the General Assembly of North Carolina on June 24, 1969, does not inhibit the Board in carrying out its constitutional duties and should not hamper the Board in its future actions. Leaving aside its dubious constitutionality (if it really did what its title claims for it), the statute contains an express ex-

ception which renders it ineffectual in that it does not prevent "any transfer necessitated by overcrowded conditions or *other circumstances which in the sole discretion of the School Board require reassignment.*"

f) The elimination without objection of the former provision which had the effect of inhibiting transfer rights of black would-be athletes.

g) Quite significantly, the Board calls upon the Planning Board, the Housing Authority, the Redevelopment Commission and upon real estate interests, local government and other interested parties to recognize and share their responsibility for dealing with problems of segregation in the community at large as well as in the school system.

h) The proposals for programs of "compensatory education" of students, and for teacher orientation and exchange of activities among black and white students. The court assumes that these somewhat vaguely stated ideas will become implemented with concrete action.

3. *The Seven School Problem.*— The Board plan proposes to close Second Ward High School, Irwin Avenue Junior High School and five inner-city elementary schools (five of which were already marked for abandonment) and to reassign their 3,000 students to outlying white schools. This part of the plan has struck fire from black community leaders and some other critics. Counsel for the plaintiffs contend that it puts an unconstitutional and discriminatory burden upon the black community with no corresponding discomfort to whites. One spokesman for a large group of dissenting and demonstrating black citizens was allowed to express his views at the August 5, 1969 hearing. Threats of boycotts and strikes have been publicized.

This part of the plan is distasteful, because all but 200 * of the students being reassigned *en masse* are black. It can legitimately be said and has been eloquently said that this plan is an affront to the dignity and pride of the black citizens. Pride and dignity are important. If pride and dignity were all that are involved, this part of the plan ought to be disapproved. The court, out of forty-year memory of four years of transportation on an unheated Model-T school bus thirteen miles each way from a distant rural community to high school in a "city" of 4,000, is fully aware how alien and strange are the sensations experienced by a school child who is hauled out of his own community and into a place where the initial welcome is uncertain or cool.

However, this part of the plan is not compulsory. Students who want to remain in the comfort of their familiar area may elect to attend the Zebulon Vance School instead; alternatives are also provided for the junior high school students.

Moreover, as one of the attorneys remarked at the first hearing in a discussion about reassignments and school busses: "The question is really not one of 'bussing' but whether what the child gets when he gets off of the bus is worth the trouble."

I personally found the better education worth the bus trip.

Despite their undoubted importance, pride and dignity should not control over the Constitution and should not outweigh the prospects for quality education of children. The uncontradicted evidence before the court is that segregation in Mecklenburg County has produced its inevitable results in the retarded educational achievement and capacity of segregated school children. By way of brief illustration a table follows showing the contrasting achievements of sixth grade students in five of the closed schools

---

* The 200 students being reassigned from Paw Creek to Woodland are white.

(Bethune, Fairview, Isabella Wyche, Alexander Street and Zeb Vance) and in five of the schools to which black students are going to be transferred:

### AVERAGE ACHIEVEMENT TEST SCORES
### SIXTH GRADE—1968–69

|  | SP. | LANG. | ACM. (Math) | WM (Word Meaning) |
|---|---|---|---|---|
| (Bethune | 45 | 34 | 41 | 41 |
| (Ashley Park | 61 | 62 | 56 | 58 |
| (Fairview | 46 | 38 | 42 | 39 |
| (Westerly Hills | 61 | 61 | 52 | 57 |
| (Isabella Wyche | 41 | 34 | 40 | 38 |
| (Myers Park | 80 | 84 | 58 | 73 |
| (Alexander Street | 45 | 38 | 34 | 40 |
| (Shamrock Gardens | 57 | 62 | 53 | 56 |
| (Zeb Vance | 38 | 34 | 39 | 42 |
| (Park Road | 71 | 75 | 58 | 66 |

This alarming contrast in performance is obviously not known to school patrons generally.

It was not fully known to the court before he studied the evidence in the case.

It can not be explained solely in terms of cultural, racial or family background without honestly facing the impact of segregation.

The degree to which this contrast pervade all levels of academic activity and accomplishment in segregated schools is relentlessly demonstrated.

Segregation produces inferior education, and it makes little difference whether the school is hot and decrepit or modern and air-conditioned.

It is painfully apparent that "quality education" can not live in a segregated school; *segregation itself is the greatest barrier to quality education.*

As hopeful relief against this grim picture is the uncontradicted testimony of the three or four experts who testified, some for each side, and the very interesting experience of the administrators of the schools of Buffalo, New York. The experts and administrators all agreed that transferring underprivileged black children from black schools into schools with 70% or more white students produced a dramatic improvement in the rate of progress and an increase in the absolute performance of the less advanced students, without material detriment to the whites. There was no contrary evidence. (In this system 71% of the students are white and 29% are black.)

Moreover, the Board's announced policy and the uncontradicted testimony of the superintendent show that serious arrangements are being made to welcome, rather than rebuff, the transferees into all school activities. This is something new and important.

No legal authority is cited that the Constitution prohibits transport of consenting black children from an inferior educational environment into a better educational environment for the purpose of complying with the constitutional requirement of equal protection of laws.

█ The choice of how to do the job of desegregation is for the School Board —not for the court.

█ The Board has wide discretion in choosing methods; many effective methods are described in the evidence; the court's duty is simply to pass on the legality of the Board's actions. It appears to the court that the improvement in the education of 4,200 school children is the one most obvious result of the Board's plan of action for 1969–70, and that this

is more important constitutionally than other considerations which have been advanced.

It is not the intention of this court to endorse or approve any future plan which puts the burden of desegregation primarily upon one race. However, there is not time before September 2, 1969 to do a complete job of reassigning pupils; the plan is a step toward more complete compliance with the law; the court reluctantly votes in favor of the 4,200 school children and approves the plan on a one-year basis.

## THE MAJOR TASK LIES AHEAD THIS FALL

■ The big job remains to be done. After implementation of the current plan, further large scale faculty transfers will still be necessary. Sixteen years after Brown v. Board of Education, some thirteen thousand school children will remain in black or nearly all-black schools. Most white students will remain in substantially all-white schools. The failure of the plan to deal with those problems of course can not be approved. The failure of the plan to include a time table for the performance of specific elements of the program of course can not be approved, Felder, et al. v. Harnett County Board of Education, et al., 409 F.2d 1070 (4th Cir., 1969). These matters must be covered by specific instructions to the Board.

All findings of fact in the previous orders of April 23, 1969, and June 20, 1969, and the supplemental findings of June 24, 1969, are incorporated herein to the extent that they are consistent with the findings, conclusions and orders herein reached and given. All evidence at all hearings is considered in reaching these conclusions.

## ORDER

1. The policy statement of the Board is approved.

2. The faculty desegregation program is approved.

■ 3. The plan to desegregate pupils by closing seven all-black schools and assigning their pupils to outlying white schools is approved only (1) with great reluctance, (2) as a one-year, temporary arrangement, and (3) with the distinct reservation that "one-way bussing" plans for the years after 1969–70 will not be acceptable. If, as the school superintendent testified, none of the modern, faculty-integrated, expensive, "equal" black schools in the system are suitable for desegregation now, steps can and should be taken to change that condition before the fall of 1970. Unsuitability or inadequacy of a 1970 "black" school to educate 1970 white pupils will not be considered by the court in passing upon plans for 1970 desegregation. The defendants contended and the court found in its April 23, 1969 order that facilities and teachers in the various black schools were not measurably inferior to those in the various white schools. It is too late now to expect the court to proceed upon an opposite assumption.

4. The plan to reassign 1,245 students from presently overcrowded black schools is approved.

5. Reassignment of the Paw Creek students to Woodland is approved.

6. The proposals of the Board for restructure of attendance lines; for consideration of pairing and grouping schools; for review of the construction programs; and for support programs, student exchange and faculty orientation are approved in principle, although for lack of specific detail and time table they are not approved as presented.

7. The Board is directed to prepare and present by November 17, 1969, the following:

(1) Plan for complete faculty desegregation for 1970–71.

(2) Plan for student desegregation for 1970–71, including making full use of zoning, pairing, grouping, clustering, transportation and other techniques, complete with statistics and maps and other data showing precisely what (subject to later movement of pupils) the assignment of pupils and teachers will be for the year 1970–71, having in mind as its goal for 1970–71

the complete desegregation of the entire system to the maximum extent possible. (The assumption in the Board's report that a school is desegregated when it has as many as 10% of a minority race in its student body is not accepted by the court, and neither the Board nor the court should be guided by such a figure.) "Possible" as used here refers to educational—*not* "political"—possibility. If Anson County, two-thirds black, can totally desegregate its schools in 1969, as they have now done, Mecklenburg County should be able to muster the political will to follow suit.

(3) A detailed report showing, complete with figures and maps, the location and nature of each construction project proposed or under way, and the effect this project may reasonably be expected to have upon the program of desegregating the schools.

8. Since a mid-city high school may prove most desirable, the Board is directed pending further orders of court not to divest itself of any land, options, rent arrangements or other access to or control over real estate which it may now have in the Second Ward area.

9. Jurisdiction is retained.