Robert W. KELLEY et al., and Henry C. Maxwell, Jr., et al., Plaintiffs,

v.

METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al., Defendants.

Civ. A. Nos. 2094, 2956.

United States District Court, M. D. Tennessee, Nashville Division.

July 16, 1970.

Avon N. Williams, Jr., Nashville, Tenn., for plaintiffs.

Robert E. Kendricks, Deputy Director of Law, and Ruthie L. Taylor, Asst. Metropolitan Atty., Metropolitan Government of Nashville and Davidson County, Nashville, Tenn., for defendants.

OPINION.

WILLIAM E. MILLER, Circuit Judge (sitting as District Judge by designation).

The issues now before the Court arise out of the continuing public school desegregation action which has been retained on the docket of this court since it was filed in September of 1955. The action is in the nature of a consolidated class action.[1] By way of a "Motion for Immediate Relief," plaintiffs commenced the present proceedings on November 6, 1969, seeking the issuance of "a temporary restraining order enjoining the defendants [School Board] from proceeding further with any and all new construction or expansion or closure of any

---

1. A Consent Order was entered by the Court on September 10, 1963, consolidating the City and County desegregation suits so as to conform with the structure of the newly created Metropolitan Nashville and Davidson County School System.

schools in the Metropolitan School System pending submission of and hearing on a new desegregation plan to achieve immediately a unitary school system." Pending the determination of all issues raised by plaintiffs' Motion for Immediate Relief, the Court has enjoined defendant School Board from purchasing new school sites, building new school structures, or expanding present school facilities.

In approaching the problems of this case it cannot be doubted that the courts, though ill-equipped to make pronouncements on educational policy, are charged with the duty to consider where necessary "problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a non-racial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems [relating to segregated schools]." The Court also has the duty to "consider the adequacy of any plans the defendants [school officials] may propose to meet these problems and to effectuate a transition to a racially non-discriminatory school system." Brown v. Board of Education, 349 U.S. 294, 300–301, 75 S.Ct. 753, 756, 99 L. Ed. 1083 (1955).

In order appropriately to frame the issues presented in this case and to derive the guiding principles for resolution of these issues, it is necessary to look to the pertinent case law in the area. At the outset, it should be stated that the Court is aware of the uncertainty among the various circuits as to the status of the law in this area since the Supreme Court rendered its decision in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). It would appear, however, that the basic meaning of *Alexander* is clear and that the disagreement among the circuits arising only as to the application of the ruling in that case.

In its brief per curiam opinion in *Alexander* the Supreme Court stated that "a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under explicit holdings of this Court the obligation of every school district is to terminate dual schools *at once* and to operate now and hereafter only unitary schools." 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (emphasis added). Though it caused some commotion, *Alexander* represents no new direction in the law, but is rather a strongly worded reiteration of the rules for desegregation announced in the case of Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). *See* Alexander, *supra*. In *Green*, the Supreme Court stated:

[A] plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable. The time for mere 'deliberate speed' has run out * * *. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*.

* * * Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief. *Id.* at 438–439, 88 S.Ct. at 1694–1695.

*Green* further states that school boards such as defendant are:

* * * clearly charged with the *affirmative duty* to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch. *Id.* at 437–438, 88 S.Ct. at 1694 (emphasis added).

In concluding its opinion in *Green*, the Court stated that:

The Board must be required to formulate a new plan and, in light of other courses which appear open to the

Board, such as zoning, fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school but just schools. *Id.* at 442, 88 S.Ct. at 1696.

■ A reading of *Green* and *Alexander* shows the lack of vitality of the oft-quoted language in Briggs v. Elliott, 132 F.Supp. 776 (S.D.S.C.1955), to the effect that while the Constitution forbade segregation, it did not require integration. *See* Hawthorne v. County School Board, 413 F.2d 53 (4th Cir. 1969); and Swann v. Charlotte-Mecklenburg Board of Education, 306 F.Supp. 1291 (W.D. N.C.1969).[2] In Deal v. Cincinnati Board of Education, 419 F.2d 1387 (6th Cir. 1969), the Sixth Circuit Court of Appeals stated its adherence to a principle similar to that set forth in Briggs v. Elliott, *supra*, to the effect that there is no affirmative duty to integrate. *See* 419 F.2d at 1390. The Sixth Circuit's position in *Deal*, however, seems to have been undermined by the opinion of the Supreme Court in Northcross v. Board of Education of Memphis, Tennessee, City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), a more recent case also arising in the Sixth Circuit. After granting a writ of certiorari, the Supreme Court in *Northcross* declared that the Court of Appeals erred in holding inapplicable the rule of Alexander v. Holmes County Board of Education, *supra*. In view of the fact that *Alexander* and its predecessor, *Green* clearly stand for the proposition that a school board has an *affirmative duty to integrate*, there is strong reason to infer that the Court of Appeals for the Sixth Circuit would not now express the view that there exists no constitutional duty on the part of school authorities to integrate schools. Rather, it is the clear message of *Alexander* and *Green* that school boards *everywhere* are charged with the affirmative duty to establish a unitary school system at the "earliest practicable date." Northcross v. Board of Education of the Memphis, Tennessee, City Schools, *supra* at 235, 90 S.Ct. 891. The "ultimate inquiry" in cases such as the present one is whether or not the school board is fulfilling this duty to take affirmative steps to find realistic measures that will transform a dual school system into a unitary desegregated system. *See, e. g.,* Henry v. Clarksdale Municipal Separate School District, 409 F.2d 682 (5th Cir. 1969); Board of Public Instruction of Duval County, Florida v. Braxton, 402 F.2d 900 (5th Cir. 1968).

Having recognized the established principle that school boards do have an affirmative duty, constitutionally imposed, to abolish dual school systems "at once," it is incumbent upon the Court, before deciding on the above stated issue, to define the scope of that duty. While the general principles of law seem clear, defining the scope of the duty presents some difficulty since many of the practical problems to be encountered in forging workable educational policies patterned on the general pronouncements of *Alexander* and *Green* have yet to be presented to the Supreme Court. That the lack of practical guidelines in this area has been recognized by the Supreme Court is evidenced by the following language of Chief Justice Burger in his concurrence in Northcross v. Board of Education of Memphis, Tennessee, City Schools, *supra,* at 237, 90 S.Ct. at 893:

" * * * [W]e ought to resolve some of the basic practical problems when they are appropriately presented including whether, as a constitutional matter, any particular racial balance must be achieved in the schools; to what extent school districts or zones may or must be altered as a constitutional matter; and to what extent transportation may or must be pro-

2. The *Swann* opinion ordered sweeping changes in the Charlotte-Mecklenburg School System including rezoning, pairing, and racial balancing of pupil population by bussing. On March 5, 1970, the Fourth Circuit Court of Appeals granted a stay in implementing the bussing provisions of the *Swann* order but denied a stay as to all other aspects of the decision.

vided to achieve the ends sought by prior holdings of the Court. Other related issues may emerge."

Therefore, in view of the lack of definitive authority in this area, the Court must turn to the practical rules for desegregation now being developed by courts in this and other circuits. An analysis of case law indicates diversity and change of opinion among and within courts trying to determine how school boards may meet the requirements of the Constitution in formulating educational plans. Out of this diversity of opinion, however, the Court will endeavor to isolate and develop those statements of judicial policy which are most appropriate to the issues presented in the instant case and most compatible with the principles of *Alexander* and *Green.*

The basic issue presented for decision may be stated simply as follows: Is defendant School Board properly fulfilling its affirmative duty to take all necessary steps to facilitate the immediate conversion of the Metropolitan Nashville and Davidson County public schools to a unitary school system in which racial discrimination will be totally eliminated? To arrive at a determination of this issue, the Court must consider several preliminary questions. First, is defendant properly performing its duty in the area of school attendance zoning? Second, is defendant meeting its obligation in the realm of faculty integration? Finally, is defendant planning construction, renovation, and location of schools in such a way as to encourage immediate and continued pupil integration?

These preliminary questions will be discussed seriatim, with a determination by the Court as to the law relating to each question, followed by an application of the law to the facts of the instant case.

## I. The Problem of School Zoning and Pupil Integration

Turning first to the basic problem of pupil integration and attendant problems of school zoning, it is important to determine just what sort of racial mix must be achieved to constitute a truly "unitary school system." In Adams v. Mathews, 403 F.2d 181, 188 (5th Cir. 1968), the Fifth Circuit Court of Appeals stated as follows:

"If in a School District there are still all-Negro schools, or only a small fraction of Negroes enrolled in white schools, or no substantial integration of faculties and school activities then, *as a matter of law*, the existing plans fail to meet constitutional standards as established in *Green.*" (emphasis added).

The severity of this standard is readily apparent when one tries to envision its application to the complexities of school zoning. Perhaps out of a recognition of these incipient difficulties, the Fifth Circuit appears to have retreated somewhat from the *Adams* standard. It now appears that the maintenance of some all-black or all-white schools in a given school system will not automatically invalidate a desegregation plan nor will it automatically indicate a shirking of responsibility by school board officials so long as the segregation is purely the unavoidable result of *de facto* housing patterns and means are made available whereby black children in the all-black areas may readily transfer to predominantly white schools. Ellis v. Board of Public Instruction of Orange County, 423 F.2d 203 (5th Cir. 1970).[3] *See also* United States v. Greenwood Municipal Separate School District, 406 F.2d 1086, 1093 (5th Cir. 1969). The recent trend in other circuits tends to uphold this view that the operation and maintenance of a particular school building, attended only by Negro children, is not *per se* un-

3. In *Ellis*, the Fifth Circuit indicated that, where, due to racial residential patterns in the county, 3 schools would remain all black and "a number" of others would re-

main all white for the present, the school desegregation plan was not rendered invalid, especially in view of the liberal majority-to-minority transfer right, the

constitutional. *See, e. g.,* Goss v. Board of Education, City of Knoxville, Tennessee, 406 F.2d 1183, 1186 (6th Cir. 1969); Deal v. Cincinnati Board of Education, *supra;* and, Beckett v. School Board of City of Norfolk, 308 F.Supp. 1274 (E.D.Va.1969).

█ Thus, there appears to be fairly general agreement that unavoidable segregation resulting from bona fide racial residential patterns is constitutionally permissible. In such instances, however, there is a strong burden upon the school board to show that such segregation is indeed unavoidable. Affirmative action which results in gerrymandering of school zone lines in order to promote segregation is, of course, forbidden. *See, e.g.,* Clemons v. Board of Education of Hillsboro, Ohio, 228 F.2d 853 (6th Cir. 1956); and Deal v. Cincinnati Board of Education, *supra.* Recent cases extend this principle to the situation where a school board fails to take action to change zone lines that were originally racially established and that continue to promote segregation. Such inaction has been deemed, and the Court believes correctly so, unconstitutional. It is clear that the comprehensive affirmative duty placed on school boards to establish a unitary system includes the duty to make a conscious effort to move zone lines and alter feeder patterns of pupils from elementary to secondary schools when such existing practices tend to preserve segregation. *See, e.g.,* Acree v. County Board of Education of Richmond County, 301 F.Supp. 1285 (S.D. Ga.1969). As the Fifth Circuit points out in Henry v. Clarksdale Municipal Separate School District, 409 F.2d 682, 689 (5th Cir. 1969), such inaction with regard to zone lines may appear to be neutral, but, in fact, tends to retard desegregation by binding pupils to "custom-segregated neighborhoods." In such a situation, the Board's failure to take corrective action amounts to the state's giving official sanction to the continuance of school segregation. *Id.*

Such inaction may be likened to a "sin of omission" and may be equally as damning from a constitutional standpoint as the more conventional situation in which segregation is upheld by the commission of *de jure* acts perpetuating or restoring a dual school system. *See* Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

█ This Court and many other courts recognize that racial residential patterns and the sale and rental of residential residential property cannot be controlled by school boards. *See, e.g.,* Deal v. Cincinnati Board of Education, *supra;* Berry v. School District of the City of Benton Harbor Civil Action No. 9, W.D.Mich. (1970). It is the Court's opinion however, that in fulfilling their affirmative duty to promote integration, school boards cannot automatically rely upon those residential patterns in maintaining present school zone lines or in establishing new attendance zones. It is true that a school board can do nothing about where the pupil population is located, but it is equally true that a school board can most certainly do something about where pupils attend school. It follows, therefore, that absent some other overriding consideration, a school board should alter old zone lines or draw new lines when a study of community residential patterns demonstrates that such action will facilitate the rapid establishment of a unitary school system. If such action is not taken under these conditions, the school board has failed to perform its constitutional duty. *See* Green v. County School Board of New Kent County, Virginia, *supra;* Henry v. Clarksdale Municipal Separate School District, *supra;* and, Robinson v. Shelby County Board of Education, 311 F.Supp. 97 (W.D.Tenn. 1970). As the above cases make clear, no concept of zoning, *including the concept of "neighborhood school attendance zones,"* is constitutionally defensible if employed in such way as to minimize pupil integration of schools. *See* Ellis v. Board of Public In-

---

plans being made for location of future school construction, and the Federal Fair Housing Act which "will serve to prevent

neighborhood entrapment." 423 F.2d at 208.

struction of Orange County, *supra*. No zoning plan, "neighborhood" or otherwise, is acceptable which needlessly perpetuates discriminatory segregation. *See* Robinson v. Shelby County Board of Education, *supra*. Where such plans are employed in preference to other plans having more promise of achieving integration, such may indicate a lack of good faith on the part of the school board and at the very least "places a heavy burden upon the Board to explain its preference for an apparently less effective method." Green v. County School Board of New Kent County, Virginia, *supra*, 391 U.S. at 439, 88 S.Ct. at 1695, 20 L.Ed.2d 716. The following language is instructive as to the duty of a school board in zone planning:

> " * * * school authorities [are required] to take affirmative action that will tend to *eradicate all vestiges of the dual system*. For example, given a choice of alternatives, a school board should draw zone lines, locate new schools, consolidate schools, change feeder patterns, and resort to other measures that will reduce the effect of past patterns tending to maintain segregation (or token desegregation)." Henry v. Clarksdale Municipal Separate School District, *supra*, 409 F.2d at 688 (emphasis added).

While the Court is of the view that defendant school authorities have not acted in bad faith, it is beyond question that good faith of school officials does not excuse the failure to act so as to establish a unitary school system. Henry v. Clarksdale Municipal Separate School District, *supra*; Swann v. Charlotte-Mecklenburg Board of Education, *supra*.

▆▆▆ In establishing school zones it is impermissible to use natural or artificial topographical features to form the boundaries of school attendance zones if the use of such features hinders the establishment of a unitary school system. Such "natural boundaries" for school zones are not constitutionally controlling. For example, if a zone encloses a black school in an area in which white students are in a majority, the "naturalness" of the boundary or the existence of reasons for the boundary unrelated to segregation does not excuse the failure to desegregate the school. *See, e. g.*, Swann v. Charlotte-Mecklenburg Board of Education, *supra*; Henry v. Clarksdale Municipal Separate School District, *supra*. In Greenwood, Mississippi, for instance, the Fifth Circuit Court of Appeals found that the Yazoo River, forming "the most natural geographic zone imaginable," could not be used as a school boundary line since it lacked "the potential of promoting desegregation." United States v. Greenwood Municipal Separate School District, 406 F.2d 1086, 1093 (5th Cir. 1969).

▆▆▆ Accordingly, based on this analysis, it is the Court's view that in the area of school zoning, school boards will fulfill their affirmative duty to establish a unitary school system only if attendance zone lines are drawn in such way as to maximize pupil integration. In drawing such lines, the defendant school board may properly consider in the total equation such factors as capacities and locations of schools, physical boundaries, transportation problems, and cost; however, none of these considerations can supersede the importance of the primary goal of maximizing integration.

▆▆▆ In looking to the facts of this case, the Court finds that many of the elementary and secondary school zone lines in the Nashville and Davidson County School System[4] have not been drawn so as to maximize integration. With the exception of zone lines drawn for new schools, the zone lines currently in existence were drawn prior to Brown v. Board of Education with the aim of maintaining segregation. Though there has been some black popu-

---

4. The Metropolitan School System had a total enrollment of 95,789 pupils for the 1969–70 school year. Currently, 81% of all white pupils are attending schools that are over 90% white, while 62% of all black pupils attend schools that are over 90% black. Exclusive of special education facilities, there are 139 schools in the system.

lation migration to formerly white areas, in large part these zone lines continue to serve quite well the segregative purpose for which they were originally established. The truth of this statement is made manifest when one examines the racial make-up of the pupil population in areas containing several contiguous attendance zones. In East Nashville, for example, there is a cluster of five elementary schools having contiguous attendance zones.[5] Of these five schools, white pupils are in the great majority in four schools, Baxter, Dalewood, Rosebank, and Bailey, while black students are in the majority in one of the schools, Inglewood.[6] As a reference to the zone map will indicate, Inglewood is completely surrounded by the four predominantly white schools, and the Inglewood zone is drawn to enclose most of the black population living in the five school area. Defendants argue that they are applying the "neighborhood" concept in the drawing of elementary school zone lines. If such a concept is indeed being applied in this five school area, it appears to the Court that it is being applied solely to perpetuate segregation. Defendants contend that one of the prime advantages of "neighborhood" schools is that they allow pupils to walk to and from school. If this is true, it is difficult to see why black pupils who live closer to Baxter or Bailey schools, for instance, are required to walk the greater distance to attend Inglewood school.

The same pattern is repeated in a seven school area in south and west Nashville. In this situation, the attendance zones for Ransom and Eakin schools are contiguous with the attendance zones for Ford Greene, Head, Carter Lawrence,

Murrel, and Clemons schools. The former two schools are almost completely white, while the latter five schools are almost totally black.[7] Once again it appears that the zone lines as drawn insure that white neighborhoods will have white schools and black neighborhoods will have black schools. As the above two illustrations make clear, by maintaining the old dual school zones, defendant has encouraged continued segregation rather than significant integration in the elementary schools.

Turning to junior high school zones, the Court finds much the same situation as in the elementary schools. Though the "neighborhood" concept is not applied in secondary school zoning, junior high school zones are drawn so that each school serves a particular residential area, or "service area" as it is sometimes referred to by defendant. These service areas cover a broader geographic area than a single neighborhood, for several elementary schools within their respective neighborhood zones feed graduating students into the junior high-school within whose zone they lie. This process is generally described in terms of a "feeder pattern." Once again, a look at the existing zone lines convinces the Court that the junior high school attendance zones and the "feeder patterns" which graduate elementary students into the junior high schools are structured so as to foster for the most part continued segregation or at best only token integration. It is apparent that the zone lines as presently drawn are designed to provide racially identifiable "black" schools for black residential areas and "white" schools for white residential areas. For example, looking at a

---

5. See Map No. 1 in Appendix.

6. Enrollment figures, with racial breakdowns,* for the five schools are as follows:

| | W | B | %B |
|---|---|---|---|
| Baxter | 544 | 69 | 11 |
| Dalewood | 589 | 30 | 5 |
| Rosebank | 602 | 0 | 0 |
| Inglewood | 254 | 378 | 60 |
| Bailey | 629 | 78 | 11 |

* Based on plaintiff's exhibit No. 3

7. See Map No. 2 in Appendix and note the following figures * on the enrollment of these schools:

| | W | B | %B |
|---|---|---|---|
| Ford Greene | 0 | 887 | 100 |
| Head | 0 | 791 | 100 |
| Carter Lawrence | 0 | 516 | 100 |
| Murrel | 0 | 328 | 100 |
| Clemons | 51 | 519 | 90 |
| Ransom | 355 | 2 | 1 |
| Eakin | 487 | 5 | 1 |

* Based on plaintiff's exhibit No. 3

cluster of six contiguous junior high school zones, the Court finds that Bass, West End, and Moore Junior high schools are all predominantly white schools with their attendance zones being drawn so as to correspond significantly with white residential areas. On the other hand, Washington, Rose Park and Waverly-Belmont are all racially identifiable as black schools and their attendance zones have been drawn in a manner effectively to prevent a significant number of black pupils from attending school outside of the black residential area.[8]

Finally, looking to the high school zones, there is similar evidence of continued duality in the school system. For example, of five contiguous high school zones, three of the schools, Cohn, Hillsboro and Central, are racially identifiable as white schools. Their attendance zone lines form the boundary line between the predominantly white residential areas in south and west Nashville and the black residential areas to the north and east. These black areas are served by Cameron and Pearl high schools.[9]

In connection with the segregative effect of present school zoning, it is interesting to note that while portable classrooms are in limited use in predominantly Negro schools, approximately 117 portables are in use in racially identifiable white schools. These predominantly Negro schools, on the basis of their rat-

ed maximum capacities, have approximately 5,400 vacancies, yet the white schools, in zones tailored to white residential sections, are over-crowded. It would seem that rezoning could serve the dual purpose of alleviating this over-crowding and, at the same time, promoting the goal of integration.

It is the Court's conclusion that defendant's current policy of attendance zoning does not facilitate rapid conversion from a dual to a unitary school system. As is evident from the foregoing discussion, the zone lines as they presently exist foster continued segregation in many instances.[10] Corresponding as they do to racial residential patterns, it is difficult to envision any other result. Historic zone lines which purposely promote segregation must be altered. In making such alterations defendant board should take those steps "which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools." Green v. County School Board of New Kent County, *supra*, 391 U.S. at 442, 88 S.Ct. at 1696, 20 L.Ed.2d 716.

Defendant argues that Negro population mobility will naturally tend to integrate predominantly white zones if the present zone lines are maintained. In support of this contention, defendant points to twelve schools which, though all-white before desegregation began, are now predominantly black schools. The Court agrees that some progress to-

---

8. *See* Map No. 3 in Appendix and note the following figures:[*]

| | W | B | %B |
|---|---|---|---|
| Bass | 777 | 12 | 2 |
| West End | 578 | 40 | 6 |
| Moore | 999 | 85 | 8 |
| Washington | 0 | 1,347 | 100 |
| Rose Park | 11 | 527 | 98 |
| Waverly-Belmont | 26 | 260 | 91 |

[*] Based on plaintiff's exhibit No. 3

9. *See* Map No. 4 in Appendix and note the following figures:

| | W | B | %B |
|---|---|---|---|
| Cohn | 960 | 45 | 4 |
| Hillsboro | 1223 | 15 | 1 |
| Central | 899 | 203 | 18 |
| Pearl | 1 | 1308 | 100 |
| Cameron | 0 | 1212 | 100 |

10. Of the 139 regular schools in the system in 1969–70, 88 had less than 10% black enrollment, 22 had 10% to 40% black enrolling (with the total enrollment of these latter 22 schools constituting only 16% of the entire metropolitan school enrollment), and, finally, 29 schools had more than 40% black enrollment. A clear racial pattern is present.

ward desegregation has been made by this natural process. Due to the Negroes' relatively weak economic strength and discriminatory real estate practices, however, it is a slow process—too slow to meet the constitutional mandate as expounded in *Alexander* and *Green* to integrate "now." Rapid, affirmative action must be taken to accomplish this purpose. No further reliance can be placed solely on the "natural" forces of population migration. Defendant must make a conscious effort to change zone lines and feeder patterns which tend to preserve segregation. In accord with the principles of law as set out above, defendant is required to take all feasible steps to maximize integration. Zone lines that are based solely on racial residential patterns are no longer permissible. Zone lines which, though based on natural topographical features or such man-made obstacles as highways or railroads, tend needlessly to encourage segregation are likewise no longer allowable. It is the Court's view that defendant should endeavor to produce a plan which sets forth unitary zone lines that are not gerrymandered to preserve segregation. *See* Robinson v. Shelby County Board of Education, *supra*. How this is to be accomplished, the size of the zones, whether pairing, consolidating, sectoring, or other devices are to be used, is left to the discretion of defendant, subject to later review by the Court if objections are filed. It appears to the Court that in conjunction with rezoning, however, defendant board should also consider the implementation of a rigidly controlled majority-to-minority transfer policy in order to foster integration and prevent resegregation. *See* United States v. Greenwood Municipal Separate School District, *supra*; Robinson v. Shelby County Board of Education, *supra*. Of course, the Court is aware of the fact that zoning alone cannot bring about total system-wide integration. For example, there may be some few schools at the core of large black or white residential areas which simply cannot be fairly or reasonably zoned so as to produce significant pupil integra-

tion. The existence of a few such schools is constitutionally permissible within an otherwise unitary system, provided that students in such schools are allowed a majority-to-minority transfer right and the facilities in such schools are in no way inferior to other schools in the system. *See, e. g.*, Ellis v. Board of Public Instruction of Orange County, *supra*; and Mannings v. Board of Public Instruction of Hillsborough County, 306 F.Supp. 497 (M.D.Fla.1969). The Court concludes, however, that defendant school board shall have the burden of proof in establishing that further integration cannot be established in such situations by a process of fair and reasonable zoning. *Cf.* Green v. County School Board of New Kent County, *supra*.

The fact that most of the present zone lines which foster segregation were drawn before the establishment of the present school board is no defense to defendant's failure to establish a unitary system. The segregative purpose of the lines is obvious and defendant's inaction in failing to alter those lines amounts to a constitutional violation just as certainly as if defendant itself had purposefully gerrymandered the zones to prevent integration. *See* Henry v. Clarksdale Municipal Separate School District, *supra*.

It should be made clear at this point that the compulsory bussing of pupils to achieve any sort of mathematically ideal racial balance is not required by decisions of the Supreme Court. *See* Northcross v. Memphis City Schools Board of Education, *supra*, 397 U.S. at 237, 90 S.Ct. 891, 25 L.Ed.2d 246 (C. J. Burger's concurrence); Deal v. Cincinnati Board of Education, *supra*; Beckett v. School Board of City of Norfolk, 308 F.Supp. 1274 (E.D.Va.1969). Accordingly, this Court exacts no such requirement of defendant. The extent and proper use of bussing of students is a matter that addresses itself to the sound judgment and discretion of the school board so long as its purpose and effect are not to foster segregation. All that is required of defendant in the area of zoning is that it take affirmative action

to maximize integration in all feasible ways so as to promote the immediate establishment of a unitary school system.

## II. The Problem of Faculty Integration

It is well recognized that faculty and staff integration is "an important aspect of the basic task of achieving a public school system wholly free from racial discrimination." United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); *see* Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). In order to implement this mandate, the Court concludes that in the instant case faculties must be fully integrated so that the ratio of black and white faculty members of each school shall be approximately the same as the ratio of black to white teachers in the system as a whole. Robinson v. Shelby County Board of Education, *supra*; Nesbit v. Statesville City Board of Education, 418 F.2d 1040 (4th Cir. 1969); Stanley v. Darlington County School District and Whittenberg v. Greenville County School District, 424 F.2d 195 (4th Cir. 1970); Pate v. Dade County School Board, 307 F.Supp. 1288 (S.D. Fla.1969); *contra,* Deal v. Cincinnati Board of Education, *supra.* *But see* Goss v. Board of Education of the City of Knoxville, 406 F.2d 1183 (6th Cir. 1969).

The *Deal* holding, based on a finding that there was "no evidence in the record that the Board assigned teachers or other staff members on the basis of race," Deal v. Cincinnati Board of Education, *supra*, 419 F.2d at 1394, is inapplicable in the instant case where, as will be demonstrated, defendant school board has exercised its control of faculty assignment to create and maintain a school system where faculties are primarily tailored to insure that white students are taught by white teachers and black students by black teachers.

School boards shall be required to create such a ratio in each and every school by utilizing appropriate teacher transfer and assignment policies. The ultimate goal to be achieved by the racial balancing of each faculty is to produce schools with faculties so constituted that on the basis of the racial composition of its faculty it is impossible to identify any school as being tailored for students of a particular race. United States v. Greenwood Municipal Separate School District, *supra,* 406 F.2d at 1093–1094. The *Greenwood* Court stated the matter quite succinctly when it said:

> "The transformation to a unitary system will not come to pass until the board has balanced the faculty of each school so that no faculty is identifiable as being tailored for a heavy concentration of Negro or white students." 406 F.2d at 1094.

Looking to the facts of this case, the Court concludes that, though practically all of the schools in the Metropolitan system have faculties composed of teachers of both races, the net result of integration at this level has been the production of only token desegregation of most faculties. As plaintiff's testimony makes clear, approximately 156 black teachers are employed in 75 predominantly white schools, while in 20 predominantly black schools, 292 black teachers are employed. Therefore, on the average in these 95 schools in the system, only two black teachers are employed by each predominantly white school while 14 are employed by each predominantly black school. Clearly, the white schools all have faculties which are tailored for white students while the black schools have faculties tailored for black pupils. Thus, while it may be true, as defendant asserts, that presently 138 out of 142 faculties employ teachers of both races, the above figures brought forth by plaintiff indicate the largely token nature of faculty integration on a school-by-school basis throughout the system.[11] Defendant points with understandable pride to the fact that of 4,366 professional staff members, 929, or 21.2% are black. Although certainly this

11. Figures based on plaintiff's testimony (Tr. 318–319) and on defendant's testimony (Tr. 846–847).

figure represents commendable progress in the number of blacks hired, the Court would point out that a consideration of equal importance in determining the effectiveness of a faculty integration policy is *where* these Negro personnel are being used. If, as is the case here, the teaching personnel in this group are assigned primarily to schools racially identifiable as black, then the school board is not fulfilling its affirmative duty to create unitary faculties.

It is the conclusion of the Court that the present policy of faculty desegregation applied by defendant is constitutionally inadequate. That policy must be altered to comply with the standards set forth above. A similar policy also must be applied to all other personnel employed by defendant school board.

III. Problems Relating to Construction, Renovation, and Location of Schools

The constitutional requirement of desegregation also finds application in the area of construction, renovation, and location of schools. School boards are required consciously to plan school construction and site location so as to prevent the reinforcement or recurrence of a dual educational system. *See, e. g.,* Felder v. Harnett County Board of Education, 409 F.2d 1070 (4th Cir. 1969); Swann v. Charlotte-Mecklenburg Board of Education, 306 F. Supp. 1291, 1299 (W.D.N.C.1969); Pate v. Dade County School Board, 307 F. Supp. 1288 (S.D.Fla.1969). Courts may properly restrain construction and other changes in the location or capacity of school properties until a showing is made that such changes will promote rather than frustrate the establishment of a unitary school system. This Court in the past has stated that school boards

may be enjoined from planning, locating or constructing new schools or additions to existing schools in such manner as to conform to racial residential patterns or to encourage or support the growth of racial segregation in residential patterns. Such operations, rather, are to be conducted "in such manner as to affirmatively promote and provide for both the present and future an equitable distribution of racial elements in the population of each School System." Sloan v. Tenth School District of Wilson County, Civ.No.3107 (M.D.Tenn., Oct. 16, 1969).

Looking to the facts of the instant case, it becomes apparent that defendant's decisions on the site selection and construction of its newest schools were not designed to promote desegregation. Since 1963, defendant has built four new elementary schools (Dodson, Granberry, Lake View, and Paragon Mills), eight new junior high schools (Apollo, Bass, Ewing Park, McMurray, John T. Moore, Neely's Bend, Rose Park and Wright) and one new high school (Dupont). Of these 13 schools, Rose Park, with an enrollment of 527 black students and 11 white students, is virtually all-Negro. The remaining twelve schools, however, are, on the average, 97% white, with none having a black enrollment as high as 10%. Three elementary schools (Cora Howe, Fall-Hamilton, and H. G. Hill) and one high school (McGavock) are currently under construction. Enrollment estimates indicate that all of these schools will be predominantly white.[12]

Seven elementary schools, two high schools, and one school for the physically handicapped are currently in the planning stage. The two high schools are being planned for predominantly black residential areas, thereby assuring predominantly black student bodies. Five

---

12. Defendants estimate the racial enrollment of Fall-Hamilton at 70 Negroes and 368 whites and H. G. Hill at one Negro and 558 whites. Although no estimate is made as to Cora Howe and McGavock, the location of the former in the area of Bailey School which has a present enrollment of 78 black and

629 white students makes probable a predominantly white school, while the latter school will consolidate the student bodies of Donelson High and Two Rivers High which, if combined today, would have an enrollment of approximately 3,318 whites and 40 blacks.

of the seven elementary schools are to be constructed in virtually all-white residential areas, while the remaining two are projected for location in all-black or predominantly black residential areas. Thus, from the foregoing, it is apparent to the Court that defendant must consider making substantial alterations in its school construction policies in order to comply with constitutional requirements.

 The Court is of the opinion that the following course of action must be taken by defendant. First, those new schools on which construction work was actually in progress as of November 6, 1969,[13] may be completed. Though this action may not produce an ideal result in light of the goal of integration, it will prevent unnecessary economic waste. Also, since, these new schools will be subject to the same zoning policies prescribed above, their segregative influences should be lessened. Second, in instances where actual construction had not begun as of November 6, 1969, defendant must revise its plans where necessary in relation to these proposed schools so as to find a location that will maximize student integration. Finally, in the future all construction plans as well as plans for closure of old schools must be governed by the principles stated herein. The purpose of the Court in making such a requirement is to insure that such plans will serve the purpose of establishing a unitary school system. *See* Sloan v. Tenth School District of Wilson County, *supra.*

 The Court will continue to retain jurisdiction in this case in order to guarantee that "a constitutionally acceptable plan is adopted, and * * * that it is operated in a constitutionally permissible fashion so that the goal of a desegregated, non-racially operated school system is rapidly and finally achieved." Raney v. Board of Education of Gould School District, 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1967); Green v. County School Board

of New Kent County, *supra,* 391 U.S. at 439, 88 S.Ct. 1689, 20 L.Ed.2d 716.

Therefore, in accord with the reasoning and conclusions set forth by the Court above, defendant is ordered to submit to the Court within thirty (30) days a comprehensive plan providing for the establishment of a unitary, non-racial school system to become effective at the beginning of the next ensuing school year. Plaintiffs shall have ten days after filing of such plan to interpose objections which shall be heard by the Court at an early date. The plan to be submitted must include proposals designed to effectuate the requirements set forth by the Court with regard to school attendance zones, faculty-staff integration, and the construction, location, and expansion of new schools.

A form of judgment shall be submitted forthwith to effectuate this opinion. This opinion and the judgment entered pursuant thereto shall constitute the Court's Findings of Fact and Conclusions of Law.

## APPENDIX

MAP LEGEND:

School zone boundaries are outlined by a heavy black line.

Names of schools and/or zones are indicated in Black.

Negro residential racial concentrations within the zones shown are indicated by a shaded area.

Areas within the zones which are left White indicate either areas of white residential concentration or non-residential areas.

Map Number 1—Selected Elementary Zones

Map Number 2—Selected Elementary Zones

Map Number 3—Selected Junior High School Zones

Map Number 4—Selected Senior High School Zones

---

13. This is the date of the Temporary Restraining Order issued by this Court to enjoin defendant from further construction, expansion, or closure of schools pending the outcome of this suit.

Map Number 1

Map Number 2

Map Number 3

Map Number 4

[A 2636]